1 | Richard A. Lazenby (State Bar No. 202105)
Email: rlazenby@victorrane.com
2 | Michael Cutler (State Bar No. 298875)
Email: mcutler@victorrane.com
3 | VICTOR RANE
9350 Wilshire Blvd., Suite 308
4 | Beverly Hills, California 90212
Telephone: (310) 388-4849
5 | Facsimile: (310) 388-4869

6 | Attorneys for Plaintiff
WEEMS & PLATH, LLC
7 |

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 |

11 | WEEMS & PLATH, LLC,                          ) Case No.:   **'20 CV 0745 GPC BGS**
                                               )
12 |                 Plaintiff,                   )
                                               ) **COMPLAINT FOR:**
13 |       vs.                                    )
                                               ) **1. BREACH OF CONTRACT**
14 | SIRIUS SIGNAL, L.L.C., ANTHONY               ) **2. UNFAIR COMPETITION**
COVELLI, ROBERT SIMONS, JR.,                   ) **3. TORTIOUS INTERFERENCE**
15 | EMLINQ, LLC, SCOTT MELE,                     )    **WITH PROSPECTIVE**
TEKTITE INDUSTRIES, INC., and                  )    **BUSINESS ADVANTAGE**
16 | DOES 1-10, inclusive,                        ) **4. CIVIL CONSPIRACY**
                                               ) **5. TORTIOUS INTERFERENCE**
17 |                 Defendants.                  )    **WITH CONTRACTUAL**
                                               )    **RELATIONS**
18 |                                              ) **6. FRAUD**
                                               ) **7. PROMISSORY ESTOPPEL**
19 |                                              ) **8. UNJUST ENRICHMENT**
                                               ) **9. DECLARATORY JUDGMENT**
20 |                                              )    **OF UNENFORCEABILITY OF**
                                               )    **THE PATENTS DUE TO**
21 |                                              )    **INEQUITABLE CONDUCT**
                                               ) **10. FALSE PATENT MARKING**
22 |                                              ) **11. SHERMAN ACT, 15 U.S.C. § 1**
                                               )    **(CONSPIRACY IN**
23 |                                              )    **RESTRAINT OF TRADE)**
                                               ) **12. SHERMAN ACT, 15 U.S.C. § 1,**
24 |                                              )    **2 AND CLAYTON ACT, 15**
                                               )    **U.S.C. § 3 (TYING)**
25 |                                              ) **13. SHERMAN ACT, 15 U.S.C. § 2**
                                               )    **(MONOPOLIZATION)**
26 |                                              ) **14. CALIFORNIA CARTWRIGHT**
                                               )    **ACT (ANTITRUST),**
27 |                                              )    **BUSINESS AND**
                                               )    **PROFESSIONS CODE 3 §§**
28 |                                              )    **16700-16758 (RESTRAINT OF**
                                               )    **TRADE)**
                                               ) **15. CALIFORNIA CARTWRIGHT**

COMPLAINT
CASE NO.:

ACT (ANTITRUST), BUSINESS AND PROFESSIONS CODE 3 §§ 16700-16758 (ATTEMPT AND CONSPIRACY TO MONOPOLIZE)

16. **LANHAM ACT (FALSE ADVERTISING)**

**REQUEST FOR JURY TRIAL**

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

Plaintiff Weems & Plath, LLC (hereinafter, "W&P"), by and through its attorneys of record at Victor Rane Group, hereby asserts its Complaint against Defendants Sirius Signal, L.L.C. (hereinafter, "Sirius"), Anthony Covelli (hereinafter, "Covelli"), Robert Simons, Jr. (hereinafter, "Simons"), Emlinq, LLC (hereinafter, "Emlinq"), Scott Mele (hereinafter, "Mele"), Tektite Industries Inc. ("Tektite"), and Does 1-50 (hereinafter, "Does")(collectively, the "Defendants") jointly and severally and states for cause the following:

## INTRODUCTION

1. W&P has been a leader in nautical instruments since 1928. W&P is the assignee and successor-in-interest of Weems & Plath, Inc. ("Weems"), the named party to the Agreement with Sirius and related Amendments, which were executed on behalf of Weems & Plath, Inc., by Peter Trogdon ("Trogdon"), the former president of Weems & Plath, Inc.

2. One of the founders of Weems, Captain Phillip Van Horn Weems, taught at the U.S. Naval Academy in Annapolis, Maryland, and then established his own school to teach the Weems System of Navigation. Charles Lindbergh studied with Captain Weems before attempting his trans-Atlantic flight. Rear Admiral Richard Evelyn Byrd Jr., a classmate of Captain Weems at the Naval Academy, came to Captain Weems for instruction, as did many others, before setting out for the North Pole.

/ /

3.      The other founder of Weems, Carl Plath, developed the first gyrocompass to be installed in a commercial vessel.  Capt. Weems and Mr. Plath teamed up in 1928 to form Weems in Annapolis, where it is still located today.

4.      Over the years, Weems and W&P has developed strong goodwill in the nautical community.

5.      This Complaint is brought under the Sherman Antitrust Act and the Clayton Antitrust Act, the laws of the State of California, and federal patent and false advertising laws. W&P seeks compensatory damages, restitution, disgorgement, treble damages, injunctive relief, and other relief, including but not limited to an award of attorneys' fees and expenses, as well as pre-judgment and post-judgment interest on the damages awarded, against Defendants, jointly and severally, for conspiring in the unreasonable restraint of trade or commerce to exclude W&P from competing in the development, production, and sale of Electronic Visual Distress Signal Devices ("eVDSDs") by unlawfully terminating its license and otherwise suppressing and eliminating competition in the sale and marketing of eVDSDs in order to artificially fix, inflate, and maintain the price of eVDSDs to unlawfully maximize economic gain by agreeing to, upon information and belief: 1) fraudulently procure, assert, license, and attempt to license invalid patents to Weems/W&P and Standard Fusee Corporation, Inc. doing business as Orion Safety Products ("Orion") for the purpose of disproportionate economic gain and increased distribution of the C-1001; 2) deceive the public, Weems, and W&P regarding the validity of the Sirius IP; 3) control the information required to manufacturer the eVDSDs; 4) control the supply of the eVDSDs and components thereof including to the exclusive worldwide licensee of the eVDSDs via refusing to manufacture, or artificially inflating the costs of manufacture of, the eVDSDs; 5) manipulate USCG federal regulations through participation in USCG committees; 6) utilize information gleaned from the USCG committee meetings to procure patents and withholding the issuance of such patents from the USCG and

the other members of the USCG committee; 7) unlawfully tie the continued

licensing of the C-1001 to a new license for the C-1002 including a substantial

upfront payment of $275,000 (in addition to the $200,000 previously paid for the

license of the C-1001) despite the C-1002 being including in the initial Agreement,

8) when (7) was unsuccessful, eliminate competition by attempting to license a

sole competitor of the eVDSDs while simultaneously terminating, without cause,

the license to the current exclusive distributor in violation of the distributor's Right

of First Offer; 9) commit multiple breaches of the Agreement including, but not

limited to, the manufacture and sale of Licensed Products during a period in which

Sirius does not dispute that the exclusive license to W&P was in full force and

effect; 10) implement an illegal Minimum Advertised Price ("MAP") policy in

order to implement vertical price fixing and price maintenance; 11) harass at least

one customer of W&P by reporting it to a governmental agency both directly and

through use of the alias Peter Saxsby in order to suppress competition in the

eVDSD market; and 12) bind Weems/W&P to provisions that served anti-

competitive purposes by seeking to restrain Weems/W&P from activities that were

not prohibited by the Licensed Patents (the "Conspiracy").

6.    Upon information and belief, at least the Tektite/Sirius Defendants

conspired to fix, stabilize, inflate, and maintain the price of eVDSDs sold to

consumers and companies in the United States from at least as early as 2013, at

which time Covelli joined Special Committee 132, through at least December 31,

2019 (the "Conspiracy Period"), and this conspiracy still continues and is ongoing.

7.    W&P seeks a full refund of the Agreement Payments paid for its

eVDSD license for the same actions by the Defendants and their co-conspirators.

Defendants' and their co-conspirators' actions caused consumers across the United

States to overpay for eVDSDs as a whole, as eVDSDs are the only electronic

option capable of meeting the USCG's visual stress signal requirements to which

every boater must adhere. Plaintiff has needlessly paid to license the purported

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

COMPLAINT
CASE NO.:                                    - 4 -

1  rights to sell eVDSDs, and now seeks to recover damages they suffered from the
2  initiation of the conspiracy until the date of filing of this action (the "Injury
3  Period").  Upon information and belief, this anticompetitive behavior has not
4  ceased but rather is ongoing.

5      8.      Covelli, Simons, and Mele as Defendants are individually liable for
6  the actions described herein because the conspiracy predated the formation of the
7  business entity Sirius that subsequently controlled the fraudulent patents and
8  purported licensing rights in question.

9      9.      Covelli, Simons, and Mele as Defendants are individually liable for
10  the actions described herein because the conspiracy was committed on their
11  individual behalves including, but not limited to, Covelli and Simons acting in
12  their personal capacity as the inventors of the Sirius IP.

13      10.      Defendants are manufacturers and distributors of eVDSDs, or
14  components thereof, used by boaters to meet the USCG's visual stress signal
15  requirements to which every boater on a boat in open water must adhere.
16  Specifically, Defendants manufacture and/or distribute the C-1001, C-1002, and C-
17  1003 (the "C Series Lights") eVDSDs purportedly designed and patented by Sirius
18  or components thereof.  The C-1003 is sold by Sirius as the newer, upgraded
19  model of, and replacement for, the C-1001.

20      11.      During the Conspiracy Period, upon information and belief,
21  Defendants and their co-conspirators conspired, combined, and contracted to fix,
22  raise, maintain, and stabilize the prices at which eVDSDs would be sold.

23      12.      Upon information and belief, in order to facilitate the conspiracy,
24  Defendants and their co-conspirators, throughout the Conspiracy Period, engaged
25  in regular, often secret communications, verbally and through electronic mail, the
26  facts of which are set out elsewhere in this Complaint, to further the Conspiracy,
27  including, but not limited to communications regarding: 1) the procurement of
28  invalid and unenforceable patents referred to herein as the Sirius IP through the

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

commission of fraud on the United States Patent and Trademark Office f("USPTO") via, at a minimum, (a) the submission of false affidavits to the USPTO and (b) the withholding of at least the Material Information from the USPTO during prosecution of the Sirius IP; 2) licensing the invalid and unenforceable Sirius IP to Weems/W&P through the issuance of false statements including, but not limited to, false statements regarding inventorship of the Sirius IP made to Weems' during its due diligence performed prior to licensing the Sirius IP; 3)  falsely marking the C-1001 with U.S. Patent Nos. D720,247 and 9,171,436 for at least three years after Defendants' received an opinion of counsel that the '247 Patent and the '436 Patent do not cover the C-1001 product; 4) otherwise falsely marking the C-1001, C-1002, and C-1003 products as "patent pending" or with other patents of the Sirius IP knowing that the Sirius IP is invalid and unenforceable; 5) controlling the supply of components and services required to manufacture the C-1001 to suppress the supply of eVDSDs as a whole by conspiring to implement a horizontal boycott by rejecting purchase orders placed by W&P with its suppliers, or delaying and artificially inflating the price of purchase orders placed by W&P with its suppliers, during a time in which it is not disputed that W&P was the exclusive worldwide distributor of the C-1001 pursuant to the Agreement, to prevent W&P from manufacturing and selling the C-1001 including sales during the Sell-Off Period; 6) controlling information required to manufacture the C-1001 to suppress the supply of eVDSDs as a whole including refusing to provide the information necessary to manufacture the C-1001 (e.g., Gerber Files) to W&P during a time in which it is not disputed that W&P was the exclusive worldwide distributor of the C-1001 pursuant to the Agreement, to prevent W&P from making the circuit board with an alternate supplier; 7) distribution of an illegal MAP policy intended to implement vertical price fixing and price maintenance of all single color eVDSDs available for sale in the relevant market to $89.95 and of all two color eVDSDs in the relevant market to $299.95;

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

8) abusing Covelli's position on the 132 Committee in order to obtain information used for the fraudulent procurement of Sirius IP; 9) abusing Covelli's position on the 132 Committee in order to manipulate the USCG Distress Signal Regulations such that they would eliminate competition in the eVDSD relevant market by removing the single color eVDSD from the pool of USCG acceptable eVDSDs, thereby leaving the Defendants' C-1002 as the only USCG-approved eVDSD available in the relevant market and artificially raising the price of eVDSDs from $89.95 to $299.95; 10) lobbying for a change in the USCG Regulations to eliminate all one color eVDSDs for the purpose of eliminating all competition in the relevant market, securing a monopoly, and artificially inflating the price of an eVDSD to $299.95; 11) the termination of Weems/W&P's rights as the exclusive distributor for the purpose of maintaining a monopoly and the high margins associated therewith; 12) the illegal tying of a license agreement for C-1002s (the tied product), including payment of an upfront license fee of $275,000, to execution of an amendment that would allow W&P to continue to distribute the C-1001/C-1003 (the tying product) despite the fact that (a) W&P had already paid an upfront license fee of $200,000, (b) W&P had invested substantial money in advertising and otherwise related to the C-1001, and (c) the Agreement already granted a license to the C-1002; 13) attempting to wrongfully terminate W&P as the exclusive worldwide distributor of the eVDSDs in breach of the Agreement and to prevent W&P from development, production, and sale of eVDSDs in order to force W&P to take a license to the C-1002 including payment of the $275,000 upfront licensing fee; 14) attempting to wrongfully terminate W&P as the exclusive worldwide distributor of the eVDSDs in breach of the Agreement and to prevent W&P from development, production, and sale of eVDSDs in order to divert the C-1001 sales of W&P to the Tektite/Sirius Defendants as C-1003 sales; 15) falsely claiming that the C-1001 was no longer being distributed by W&P; 16) when W&P would not agree to license the C-1002 without receiving additional

information from the Sirius Defendants, attempting to wrongfully terminate W&P as the exclusive worldwide distributor of the eVDSDs in breach of the Agreement in favor of licensing the fraudulent Sirius IP to the owner of the sole competitive eVDSD product in order to obtain a monopoly; 17) harassing at least one customer of W&P by reporting it to a governmental agency both directly and through use of the alias Peter Saxsby in order to suppress competition in the eVDSD market; and 18) binding Weems/W&P to provisions that served anti-competitive purposes by seeking to restrain Weems/W&P from activities that were not prohibited by the Licensed Patents(the "Conspiracy Acts").

13.     Upon information and belief, as a result of Defendants' and their co-conspirators' unlawful conduct, Plaintiff and consumers paid more for the right to distribute and own, respectively, eVDSDs than they would have if a competitive market had determined eVDSD prices.

14.     Plaintiff sustained damages as a result of Defendants' and their co-conspirators' anticompetitive conduct as alleged herein.  Plaintiff also sustained damages as a result of breach of contract, unfair competition, tortious interference with business relations/expectancy, civil conspiracy, tortious interference with contractual relations, fraud, promissory estoppel, direct and indirect unjust enrichment, false marking, and false advertising as further set forth herein.

## PARTIES

**Plaintiff**

15.     Plaintiff W&P is a Maryland limited liability company with its principal place of business at 214 Eastern Avenue, Annapolis, Maryland 21403. The sole member of W&P, Michael Flanagan, is a citizen of New Jersey.

**Defendants**

16.     Upon information and belief, Defendant Sirius is a limited liability company organized under the laws of the State of California with its principal place of business located in the State of California.  All members of Sirius Signal,

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

L.L.C. are citizens of California.  Although Sirius Signal, L.L.C. has represented itself at times as a corporation (e.g., "Sirius Signal, Inc.") in related documents, no such corporation is known to exist, and Sirius's representation as such appears to be false, both as a matter of fact and as a matter of law.

17.     Upon information and belief, Defendant Covelli resides in the State of California at 6541 Vispera Place, Carlsbad, California 92009.  Covelli is an owner of, a member of, and the CEO of Plaintiff Sirius.  Sirius has only three other members, one of whom is Simons, who is a purported co-inventor with Covelli in the Sirius IP (as defined below) that was purportedly licensed originally to W&P's predecessor-in-interest, ("Weems") pursuant to the agreement Sirius entered with Weems on December 31, 2015, as amended three times, i.e., the first amendment executed February 8, 2016 (the "First Amendment"), the [Second] Amendment made March 10, 2016 (the "Second Amendment"), and the Third Amendment made August 18, 2017(the "Third Amendment")(collectively, the "Agreement"), which license was transferred thereafter to W&P on or about September 20, 2018.

18.     Upon information and belief, Simons resides in the State of California at 3634 7th Avenue, 8A, San Diego, California 92103.  Simons is an owner and member of Sirius and is a purported co-inventor with Covelli of the Sirius IP that was purportedly licensed to Weems/W&P pursuant to the Agreement.

19.     As members and owners of Sirius, Covelli and Simons are not employees of Sirius under relevant federal and state laws pertaining to employment and taxation.  Rather, Covelli's and Simons' authority to bind, act on behalf of, and in concert with, Sirius arises out of Covelli's and Simons' ownership and member status relative to Sirius.  Likewise, as individuals, Covelli and Simons are distinct from the legal entity Sirius, and Covelli and Simons have acted independently on their personal behalves and have also used Sirius to act as Covelli's and Simons' agent and alter ego in conduct described herein.

/  /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

1    20.    Upon information and belief, Emlinq is a California limited liability

2    company with its principal place of business at 2125C Madera Rd., Simi Valley,

3    California 93065.  Emlinq is a supplier of circuit boards for at least the C-1001

4    and, upon information and belief, also the C-1002 and C-1003.

5    21.    Upon information and belief, Mele resides at 18 Amity Court,

6    Langhorne, PA 19047 and is owner and President of Tektite.

7    22.    Upon information and belief, Tektite is a New Jersey corporation with

8    its principal place of business at 309 North Clinton Avenue, Trenton, New Jersey

9    08638.  Tektite is a manufacturer of lights and strobes including, but not limited to,

10   the C-1001 and, upon information and belief, the C-1002 and C-1003.  Tektite is

11   the owner of expired U.S. Patent No. 6,168,288, which discloses a product

12   materially relevant to the C Series Lights, and, upon information and belief, is the

13   developer and designer of the C Series Lights.

14   23.    The true names and capacities, whether individual, corporate,

15   association or otherwise of Defendants DOES 1 through 10, inclusive, are

16   unknown to W&P who otherwise sues these Defendants by such fictitious names.

17   Each Defendant is sued individually and/or in his/her official capacity as defined in

18   this Complaint.  W&P will seek leave to amend this Complaint to show the true

19   names and capacity of these Defendants when they have been ascertained.  Each of

20   the fictitiously named Defendants is responsible in some manner for the conduct or

21   liabilities alleged herein, as set forth in more detail below.

22   **Unidentified Co-Conspirators**

23   24.    Other individuals and entities, not named as Defendants in this

24   Complaint, may have participated as co-conspirators with Defendants in the

25   violations alleged herein, and aided and abetted Defendants and performed acts

26   and made statements, all in furtherance of the conspiracy.

27   25.    The true names and capacities of some of these co-conspirators,

28   whether individual, corporate, associate, or representative, are unknown to Plaintiff

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

at this time. Plaintiff may amend this Complaint, as necessary, to allege the true names and capacities of additional co-conspirators as their identities become known through discovery or otherwise.

26.     At all relevant times, other individuals and entities referred to herein as "unidentified co-conspirators," the identities of which are presently unknown, conspired with Defendants in the unlawful conspiracy described herein.

27.     The acts alleged herein that were performed by each of the unidentified coconspirators were fully authorized by each of these unidentified co-conspirators, or were ordered, or committed by duly authorized officers, managers, agents, employees, or representatives of each unidentified co-conspirator, while actively engaged in the management, direction, or control of its affairs.

## JURISDICTION

28.     This Court has federal question jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §§ 1 and 2 (Sherman Antitrust Act jurisdiction), 15 U.S.C. §§ 15 & 26 (Clayton Antitrust Act jurisdiction), 28 U.S.C. § 1331 (general federal question jurisdiction), & 28 U.S.C. § 1337 (antitrust jurisdiction) and 35 U.S.C. 292(a) (false marking).  The Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 (pendent jurisdiction).

29.     This Court has personal jurisdiction over the Defendants pursuant to federal principles of due process and to California Code of Civil Procedure § 410.10 (California "Long Arm Statute").

30.     This Court has personal jurisdiction over Sirius, because it is a Limited Liability Company organized and existing under the laws of the State of California, with its principal place of business in California.

31.     This Court has personal jurisdiction over Covelli, because he is a resident and citizen of the State of California.

32.     This Court has jurisdiction over Simons, because he is a resident and citizen of the State of California.

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

33.     This Court has jurisdiction over Emlinq, because it is a Limited Liability Company organized and existing under the laws of the State of California, with its principal place of business in California.

34.     This Court has jurisdiction over Tektite, because it regularly transacts business and has substantial contacts in California, and as Tektite purposefully availed itself of the privilege of conducting activities in California, and the claims in this Complaint arise out of Tektite's activities in California.  Tektite is a distributor of Sirius products since at least as early as August 15, 2015, and Tektite derives substantial revenue from transacting business in the district via the manufacturing for Sirius since of the C-1001 product, upon information and belief, since as early as 2014, and upon information and belief, the manufacturing of the C-1002 and C-1003 products since at least as early as 2018.

35.     This Court has jurisdiction over Mele, because he personally regularly transacts business and has substantial contacts in California, and as Mele purposefully availed himself of the privilege of conducting activities in California, and the claims in this Complaint arise out of his activities in California.  Upon information and belief, Mele is an owner of Tektite, and through Tektite's business in this forum, he derives substantial revenue from Tektite's transacting business in this forum via the manufacturing for Sirius since of the C-1001 product, upon information and belief, since as early as 2014, and upon information and belief, the manufacturing of the C-1002 and C-1003 products since at least as early as 2018.

36.     Mele has acted independently on his personal behalf and has also used Tektite to act as his agent and alter ego in conduct described herein.

37.     Upon information and belief, Tektite is a façade and a vehicle for Mele's participation in the Conspiracy, and Tektite has no identity of its own.

38.     Upon information and belief, at least Covelli, Simons, and Mele conceived of the Conspiracy and personally managed every aspect of the

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

Conspiracy as detailed above.  There is sufficient identity of interest between Mele and Tektite for the acts of one to be attributable to the other.

**VENUE**

39.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

40.     Venues is also proper in this district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391 (c) and (d), because Sirius, Covelli, and Simons reside, are found, and/or have an agent, in this district, are domiciled in this district, conduct business in this district, and are subject to the Court's personal jurisdiction with respect to this action in this district.

41.     Additionally, venue is proper in this district pursuant to 15 U.S.C. § 22, and 28 U.S.C. § 1391(c) and (d), because Emlinq, Mele, and Tektite conduct business in this district, and are subject to the Court's personal jurisdiction with respect to this action in this district.

**FACTS RELEVANT TO ALL CAUSES OF ACTION**

42.     W&P repeats and re-alleges each of the foregoing allegations and following allegations as though fully set forth herein.

**A. eVDSD Background**

43.     eVDSD stands for "electronic visual distress signal devices."  The USCG has promulgated regulations that require boaters in a boat on open water to carry current, non-expired USCG-approved day and night signals, namely, 46 CFR 161.013 (the "Night Vision Distress Signal Regulations") and 33 CFR 175.130 (the "Day Vision Distress Signal Regulations)(collectively the "USCG Distress Signal Regulations").

44.     Acceptable signals include the following combinations: 1) three hand-held red flares (day and night) under 42 months of age; 2) one electric distress light (night only) and one flag (day); and 3) (i) one hand-held red flare and two

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone:  (310) 388-4849

parachute flares (day and night), or (ii) one hand-held orange smoke signal, two floating orange smoke signals (day) and one electric distress light (night only), wherein the flares must be under 42 months of age.

45.     As such, eVDSDs should provide a low cost alternative for boaters to comply with the mandatory USCG Distress Signal Regulations because, unlike pyrotechnic flares, eVDSDs do not require continual replenishment every forty-two months.  Further, eVDSDs are sold by at least Sirius as an "environmentally-conscious legal alternative to toxic marine flares."

46.     At least the Sirius Defendants manufactured and sold a packaged product including a C-1001 eVDSD along with a flag (the "C-1001 Kit") and now manufacture and sell a packaged product including a C-1003 eVDSD along with a flag (the "C-1003 Kit") that allows boaters to be fully compliant with the USCG Distress Signal Regulations as the C-1001/C-1003 satisfies the Night Vision Distress Signal Regulations and the flag satisfies the Day Vision Distress Signal Regulations.

47.     To date, the Sirius Defendants have procured a multitude of fraudulently obtained eVDSD patents and have additional patent applications pending including: U.S. Patent D720247 based on U.S. Patent Application 29/493,224 filed on June 6, 2014 (the "'247 Patent"); U.S. Patent 9171436 based on U.S. Patent Application 14561197 filed on December 4, 2014 (the "'436 Patent"); U.S. Patent D784175 based on U.S. Patent Application 29557241 filed on March 07, 2016 (the "'175 Patent"); U.S. Patent 9682754 based on U.S. Patent Application 15095727 filed on April 11, 2016 (the "'754 Patent");  U.S. Patent D811920 based on U.S. Patent Application 29595834 filed on March 02, 2017 (the "'920 Patent"); U.S. Patent Application 15624033 filed on June 15, 2017 (the "'033 Application");  U.S. Patent D844477 based on U.S. Patent Application 29638591 filed on February 28, 2018 (the "'477 Patent"); U.S. Patent 10227114 based on U.S. Patent Application 16004987 filed on June 11, 2018 (the "'114

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

Patent"); U.S. Patent Application 16692449 filed on November 22, 2019 (the "'449 Application"); and U.S. Patent Application 16245947 filed on January 11, 2019 (the "'947 Application")(collectively the "Sirius IP").

48.     The Sirius Defendants have used, and continue to attempt to use, the fraudulently procured Sirius IP as a tool in furthering the Conspiracy and in committing the Conspiracy Acts as detailed elsewhere herein.

**B. History**

49.     On August 5, 1999, a patent application was filed for a "Flashlight with Light Emitting Diodes" naming Christian P. St. Claire as the inventor,  which patent application issued as U.S. Patent No. 6,168,288 (the "'288 Patent") on January 2, 2001.

50.     On July 23, 1999, the application for the '288 Patent was assigned from the inventor to Tektite Industries West, LLC ("TIW").

51.     Upon information and belief, Mele, Elizabeth Mele, and Veronica Mele were all involved in TIW as they are all listed as managers or members on one or more of the TIW Limited Liability Company Statement of Information filed with the State of California on March 22, 2002 and January 3, 2003.

52.     On January 16, 2001, the '288 Patent was assigned from TIW to Tektite.

53.     The '288 Patent expired twice for nonpayment of maintenance fees. The first time occurred on February 2, 2005, and Tektite petitioned to accept the filing of a late maintenance fee payment, which was granted on September 21, 2005.

54.     The '288 Patent expired again on January 28, 2013 due to failure to pay the maintenance fee.  Upon information and belief, despite the expiration of the patent, Tektite and Mele continued to falsely mark the product associated with the '288 Patent until 2020.

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

55.      Upon information and belief, despite the expiration of the patent and the fact that Sirius did not own the patent, the Tektite/Sirius Defendants marked the C-1001 product with the number of the '288 Patent and, at a time during which the '288 Patent had expired, falsely represented to Weems that the '288 Patent was valid and covered the C-1001 product.

56.      Upon information and belief, at least Covelli, Simons, and Mele began conspiring in or around 2013 to enter into the eVDSD business and to commit the Conspiracy, including: 1) agreeing to apply for eVDSD patents in the name of Covelli and Simons, thereby falsely naming inventors and/or intentionally omitting at least one inventor to reduce the chance that the USPTO would correlate the technology of the new eVDSD applications with the '288 Patent; and 2) agreeing that Covelli join USCG Special Committee 132 (the "132 Committee"), which is a committee of the Radio Technical Commission for Maritime Services ("RTCM"), in order to manipulate the USCG to obtain a competitive advantage.

57.      The 132 Committee was chartered in 2013 to create regulations and issue standards relating to "Electronic Visual Distress Signals".

58.      In furtherance of the Conspiracy, Covelli became a member of the 132 Committee, and, upon information and belief, remains a member of the 132 committee, and was personally involved in the 132 Committee's creation of RTCM Standard 13200.0, that was published on June 21, 2018 and adopted on December 21, 2018 (the "2018 RTCM Standard").

59.      Upon information and belief, Covelli has obtained information from these committee meetings and improperly used this information to fraudulently attempt to patent eVDSD products that he did not invent, by falsely claiming inventorship of the eVDSD devices and failing to submit material prior art to the USPTO during prosecution of the eVDSD Patents including, without limitation: 1) the USCG Distress Signal Regulations that dictate the specifications of any USCG-approved eVDSD; 2) the 2018 RTCM Standard; 3) the '288 Patent; and 4) material

Victor Rane
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

relating to Covelli's work on the USCG Committee (collectively referred to herein as the "Material Information").

60.     Covelli and Simons failed to disclose to the USPTO anyone associated with Tektite as an inventor of the Sirius IP despite the fact that: 1) Mele claims that Tektite is responsible for the design of the C-1001 product; and 2) the '288 Patent discloses an on/off switching mechanism identical to that of the C-1001, in which the activation of the light is done via rotation of the lens through which the light shines (the "On/Off Lens Switch") as is claimed in Sirius' '754 Patent.

61.     At least as early as July 15, 2015, the C-1001 was being falsely advertised as a patented product and was touted as the only eVDSD approved by the USCG.

62.     At least as early as July 15, 2015, the Web page located at www.siriussignal.com (the "Sirius Web Site") depicted a picture of the C-1001 and the following language to the left side thereof "Complies with all U.S. Coast Guard requirements for 'Night Visual Distress Signals' 46 CFR 161.013.  When combined with the included daytime distress signal flag, meets all USCG Federal Requirements for carriage of DAY and NIGHT VDS.  Designed, engineered, *patented*, and produced in the USA" (emphasis added).  At this time, no Sirius U.S. Patent that purported covered the C-1001 product had been issued, and the '288 Patent was expired.

63.     Upon information and belief, at least as early as August 15, 2015, Tektite and Mele were associated with the Sirius Defendants as the Sirius Web Site listed Tektite as a distributor at least as early as that date, and, upon information and belief, Mele is the owner of Tektite.

64.     As early as September 14, 2015, the Sirius Defendants advertised its C-1001 product as the *only* USCG-certified  alternative to a pyrotechnic flare.
/ /

65.     On December 31, 2015, Weems and Sirius entered into the Agreement for distribution of eVDSDs, which Weems believed were patented devices, and pursuant to which Weems would have an exclusive license to manufacture, distribute, advertise, publicize, market and sell the Licensed Products (as defined below) (the "License") and other rights including, without limitation, the Right of First Offer pursuant to Section 6 of the Agreement (the "Exclusive Rights") in exchange for Weems making a substantial upfront payment to Sirius of two hundred thousand dollars ($200,000) and paying significant ongoing royalties to Sirius (initially thirty percent) on sales of the Licensed Products (collectively, the "Agreement Payments").

66.     At the time the Agreement was negotiated with Weems, the C-1001 product was falsely marked with at least "D720,247" as a part of the conspiracy to inflate the prices of the C-1001 and to induce Weems into signing the Agreement and paying excessive Agreement Payments due to the false belief that the C-1001 product was patented, that Weems was obtaining an exclusive license to valid and enforceable patents, and that a license was required to sell the C-1001 and enter the eVDSD market.

67.     During negotiation of the Agreement, Covelli knowingly misrepresented that the C-1001 was patented, and that additional patents were being pursued, in order to induce Weems to execute and perform the Agreement, including payment of the Agreement Payments.

68.     Covelli knowingly directed W&P to falsely mark the products with the numbers of patents that: 1) were expired; 2) did not cover the product; and 3) which neither Covelli, Simons, nor Sirius owned or licensed.

69.     Section 12b. _Governing Law_ of the Agreement executed by Sirius and Weems states, "This Agreement and the rights and obligations of the parties under it are governed by and interpreted in accordance with the laws of the State of Maryland (without regard to principles of conflicts of law)."

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

70.     The Third Amendment of the Agreement states in Section 8 <u>Binding Agreement</u>, "The Agreement as modified herein shall be binding on and inure to the benefit of the … legal representatives, … owners, … members, … and any other person or entity claiming under or through the parties."

71.     Covelli and Simons are legal representatives, owners, and members of Sirius, and Covelli personally signed the Third Amendment, thereby personally binding himself and Simons and making the Agreement binding on them as individuals.

72.     The Third Amendment further states in Section 9 <u>Authority to Execute</u>, "The parties to the Third Amendment and the Agreement as modified warrant, covenant and agree that the persons executing this Agreement are authorized and empowered to enter into and execute this Agreement as modified for and on behalf of the person or entity they represent, and that by their execution of the Agreement, each respective person or entity they represent, and all persons, partnerships, corporations, joint ventures and any person or entities affiliated with them, shall be bound by the terms of this Agreement."

73.     Covelli signed the Third Amendment and was authorized and empowered to personally bind himself and Simons, as individuals, thereby making the Agreement binding on them individually.

74.     "Know-How" is defined in the Agreement, as amended, to "have its usual and accepted meaning such as, by way of example, but not of limitation, all factual knowledge, proprietary information, trade secrets, procedures, processes, methods, designs, discoveries, inventions, patent application, licenses, software and source code, programs, prototypes, techniques, ideas, concepts, data, engineering, manufacturing information, techniques, ideas, concepts, data, engineering, manufacturing information, specifications, diagrams, schematics, or rights or works of authorship, that give to the one acquiring it an ability to study, test, produce, formulate, manufacture or market the SOS Distress Light SOS A-

1001 sold by Sirius or variations thereof, which one otherwise would not have known how to study, test, produce, formulate, manufacture or market in the same way." Although the Agreement refers to an A-1001, upon information and belief, the A-1001 was never manufactured and sold and the product number used in commerce for the intended A-1001 was C-1001.

75.     "Licensed Products" are defined in the Agreement, as amended, to include, *inter alia*, "[a]ny product made, used, sold, imported or offered for sale that includes or is covered by any of the Patents or Know How."

76.     "Patents" are as defined in the Agreement, as amended, and include "(b) all current and future patents related to the SOS Distress Light SOS A-1001 sold by Sirius or variations thereof that may be granted thereon [and] (c) any future patents and/or patent applications owned by Sirius and covering one or more aspects of the SOS Distress Light SOS A-1001 sold by Sirius as of December 30, 2015 or variations thereof."  As such, the patents licensed under the Agreement include all of the Sirius IP including any future patents for the C-1002.

77.     In executing the Agreement, the Sirius, Covelli, and Simons unlawfully sought to do more than that which would have been authorized by a limited monopoly due to its patents (if in fact the patents were valid) by requiring, in Section 4 of the Agreement, entitled "Covenants of W&P", that Weems, and subsequently W&P, covenant that it "will not manufacture, sell, or distribute any products that perform the same or a similar function as the Licensed Products other than the Licensed Products."  This provision of the Agreement served anti-competitive purposes because it sought to restrain Weems and W&P from activities that were not purportedly prohibited by the Licensed Patents.

78.     At least as early as April 24, 2018, Orion began offering an Electronic SOS Beacon Locator Kit, which was/is manufactured and sold by Orion and includes an eVDSD and a flag (the "Orion Kit").

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

79.     On approximately April 30, 2018, Orion notified Sirius and Weems via a letter (the "Orion Letter") that the C-1001 Kit included packaging with "incorrect statements" relating to its claim that it is the "ONLY ELECTRONIC FLARE that meets U.S. Coast Guard Requirements" and that it is "the ONLY ALTERNATIVE to traditional flares" (emphasis in the original). Orion further indicated that the Weems Web Site indicated that the "SOS Distress Light is the ONLY LED Visual Distress Signal Device that meets U.S. Coast Guard requirements to completely replace traditional pyrotechnic flares" and that this was also an incorrect statement, and asserted that these "statements violate Section 43(a) of the Lanham Act in that they are false and misleading statements of fact that misrepresent the characteristics and qualities of both your company's and Standard Fusee's products."

80.     Upon information and belief, in response to the Orion Letter, Sirius and Weems phased out all use of this language.  Further, at that point in time, it was determined that Orion did not infringe upon any of the issued patents in the Sirius IP, but it was understood by Weems that patents were being pursued upon which the Orion Kit would infringe.

81.     Upon information and belief, prior to the purported termination of the Agreement, at least the Sirius Defendants held discussions about the termination of the W&P Agreement and the potential licensing of the Sirius IP to Orion in violation of W&P's Right of First Offer pursuant to Section 6 of the Agreement which states "[i]f at any time during the Term and for a period of one (1) year thereafter, (i) Sirius shall desire to sell, transfer, assign or otherwise convey, whether in whole or in part, the Know-How related to the Licensed Products, or (ii) Sirius shall desire to grant control of Sirius to a person or entity other than to W&P, or (iii) Sirius shall desire to grant licenses for other technologies, patents, trademarks, or products that it may from time to time develop, Sirius agrees that it shall provide W&P with sufficient notice of any such sale or licensing opportunity

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

to permit W&P to enter into discussions with Sirius concerning such opportunity and Sirius further agrees that it shall in good faith review any reasonable written offer by W&P concerning any such opportunity.  The term of this Section 7 [sic] shall survive the expiration or earlier termination of this Agreement" (the "Right of First Offer").

82.　　At some point prior to purported termination of the Agreement by Sirius, without the prior knowledge of W&P, the Sirius Defendants and Orion engaged in discussion about at least the license of a portion of the Sirius IP without offering W&P the Right of First Offer, in violation of at least Section 6 of the Agreement.

83.　　Upon information and belief, at least prior to the purported termination of the Agreement, the Sirius Defendants were conspiring to take all C-1001 business from W&P by advertising the C-1001 as a discontinued product and advertising the new C-1003 as the replacement for the C-1001.

84.　　Upon information and belief, the Sirius Defendants conspired to deceive consumers and retailers into believing that the C-1001 was phased out, and the C-1003 was needed to replace it and stay current with the USCG Regulations when in reality, this was just an excuse to divert business from W&P to the Tektite/Sirius Defendants and to increase profits for Emlinq via its manufacturing of the circuit boards for same.

85.　　On April 23, 2019, the Sirius Defendants asked W&P to execute an amendment to the Agreement (the "Fourth Amendment") in which, *inter alia*, the exclusive license would be amended to become a non-exclusive license, and Sirius would have the rights to license its purported Sirius IP to any party. Upon information and belief, the Sirius Defendants intended to create a monopoly by converting W&P to a non-exclusive agreement to allow the Sirius Defendants to place Orion under license to its fraudulent patents so that it would obtain a monopoly in the eVDSD market.

86.     On April 26, 2019, Flanagan held a call with Covelli in which Flanagan indicated that the amendment was not acceptable in its current form, to which Covelli responded that if the amendment was not acceptable in its current form, Flanagan would need to negotiate an agreement for the license of the new multi-colored light contemporaneously with negotiation of the amendment, the new license to include an upfront payment of $275,000.  Flanagan confirmed this conversation in writing on Monday, April 29, 2019 and asked for a proposal for the multi-colored light.

87.     On May 1, 2019, Covelli replied that "[i]n order to work the model through I need to know what you are proposing in regard to a royalty reduction in our current agreement."  In other words, the negotiation of the royalty and other terms of the licensing of the C-1001/C-1003 was dependent upon W&P licensing the C-1002 multi-colored light under favorable terms to Sirius, and as such, Covelli could not price the license for the C-1002 without knowing the fees to be paid to license the C-1001/C-1003.

88.     On May 24, 2019, the Sirius Defendants again asked W&P to execute an amendment to the Agreement in which, *inter alia*, the exclusive license would be amended to become a non-exclusive license, and Sirius would have the rights to license its purported Sirius IP to any party.

89.     On May 29, 2019, Flanagan replied with a marked up amendment in which Sirius would only have the rights to license the Sirius IP to one other party, namely Orion.

90.     On June 1, 2020, Covelli texted Flanagan that he "sent your amendment to Annapolis counsel."

91.     On June 10, 2020, Covelli held a phone call with Flanagan in which he refused to execute the Fourth Amendment unless W&P simultaneously licensed the C-1002 including an upfront payment of $275,000.

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

92.     The following day, Sirius followed up with a written offer to W&P for a license to the C-1002 in exchange for an upfront payment of $275,000 plus ongoing royalties despite the fact that the C-1002 is a Licensed Product.   If for any reason the multi-colored light is not considered to be a Licensed Product, then Sirius is in breach of the express terms of the Agreement, because, upon information and belief, Sirius negotiated with at least Orion to license, the new, multi-colored light prior to  offering this opportunity to W&P in violation of W&P's Right of First Refusal.

93.     Even when Sirius eventually did purportedly offer the C-1002 to W&P on June 11, 2019, Sirius did so without providing support for projected sales or other material information, such as estimated manufacturing costs, which would be critical for W&P to make an informed decision.  Sirius then retracted the offer while refusing to provide the additional information, thereby further depriving W&P of its Right of First Offer.

94.     Upon information and belief, the Defendants conspired to cut off the supply of circuit boards and finished C-1001s to W&P in an effort to effectuate the diversion of W&P's business to Sirius, and this conspiracy was carried out prior to, and after, the date upon which Sirius contends the Agreement was terminated.

95.     On June 26, 2019, Covelli sent a letter to W&P declaring that "we have chosen not to renew the licensing agreement when it expires on December 31 of this year" (the "First Declaration of Intent to End Agreement"). There was no mention by Covelli of any alleged breach of the Agreement by W&P in the First Notice of Intent to End Agreement.

96.     On July 26, 2019, Covelli wrote another letter to Flanagan alleging that (a) W&P had breached the Agreement and (b) the Agreement would terminate on August 25, 2019 (the "Second Declaration of Intent to End Agreement"). The July 26, 2019 letter was the first time Covelli notified W&P that the Sirius Defendants considered W&P in breach of the Agreement.

97.     On July 2, 2019, Covelli confirmed to Flanagan that "there was no going forward with Weems & Plath" because he was licensing the Sirius IP to Orion.  Flanagan restated these sentiments in an email to Covelli a few days later on July 8, 2019, and he did not refute them.

98.     It is well established that a patentee's termination of a licensee in concert with a competing licensee as occurred in this case, is not entitled to an antitrust exemption.  The patent system has no interest in permitting the patentee's monopoly to be used as a screen for the maintenance of a horizontal cartel at the licensee level.  Defendants, in furtherance of their conspiracy and in breach of the Agreement, decided to terminate W&P in an effort to reduce the competition in the eVDSD marketplace from W&P and Orion, to solely Orion.

99.     On July 27, 2019, Covelli wrote a letter to Flanagan/W&P falsely accusing W&P of breaching the Agreement and further stating that "the breaches … are incapable of being cured" and "[a]s a result, the agreement will terminate on August 25, 2019."

100.     Upon information and belief, when Flanagan/W&P disputed the breach, the Defendants set out on a course of conduct to cease manufacturing and supplying W&P with the C-1001 and components thereof in order to prevent W&P from selling the C-1001 in accordance with its Exclusive Rights.

101.     Upon information and belief, the Defendants are now conspiring to further raise the cost of an eVDSD from approximately $89.99 (for a C-1003) to $299.95 (for a C-1002) via continuance of the aforementioned actions of the Conspiracy including, but not limited to, agreeing to the acts of continuing to obtain fraudulent patents, and eliminating Sirius's sole competition (the Orion Kit) by attempting to license Orion under the false patents.

**(1)     Emlinq.**

102.     Emlinq is a circuit board manufacturer, from which Weems/W&P repeatedly, for a period of nearly four years, obtained circuits boards for use in the

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

manufacturing of the C-1001, and with which Weems/W&P had an ongoing customer-supplier business relationship.  On July 16, 2019, W&P sent a purchase order to Emlinq, for five thousand (5,000) circuit boards for use in manufacturing the C-1001 (the "Emlinq Purchase Order").

103.     On July 29, 2019, Emlinq informed W&P that it had a call with Covelli regarding the Emlinq Purchase Order.

104.     Upon information and belief, in furtherance of the Sirius Defendants' activities to manufacture the Licensed Products, and in breach of the Agreement, Covelli, Simons, and/or Sirius placed an order with Emlinq for the same components that W&P had ordered from Emlinq.

105.     On July 29, 2019, for the first time in nearly four years, Emlinq informed W&P that it was "unable" (or implicitly unwilling) to fulfill the W&P order.

106.     Upon information and belief, Covelli is a close acquaintance of a representative of Emlinq, and Covelli conspired with the Emlinq representative and exerted inappropriate influence on Emlinq to interfere with the filling of the Emlinq Purchase Order.

107.     Upon information and belief, Covelli and Sirius made to Emlinq statements that were literally false and/or likely to mislead, confuse or deceive regarding W&P's rights to manufacture the Licensed Products, and Covelli's and Sirius's statements caused commercial injury to W&P by harming W&P's ability to manufacture, and therefore sell, the Licensed Products, including introducing inappropriate competition from Sirius in breach of W&P's Exclusive Rights under the Agreement.

108.     Upon information and belief, because of Covelli's inappropriate influence on Emlinq, Emlinq permanently stopped supplying the circuit boards to W&P.

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

Victor Rane
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

109.     Without the additional circuit boards, W&P was limited in W&P's ability to manufacture and sell the C-1001, including during a time period that Sirius does not dispute the Agreement was still in effect and during the Sell-Off Period (as defined below).

**(2)     Tektite.**

110.     Tektite is a manufacturer of various products including lights and strobes, from which Weems/W&P repeatedly has obtained C-1001s and with which Weems/W&P had an ongoing customer-supplier business relationship for nearly four consecutive years.  After this length of doing business, unexpectedly, on August 15, 2019, Tektite notified W&P that, for all future orders, it would no longer accept customer supplied parts from W&P with the exception of the clamshell insert card.

111.     On August 26, 2019, W&P sent purchase order 19-6009PO to Tektite for ten thousand (10,000) SOS Body with Lens, "Complete Assembly includes packaging in supplied clamshell, card insert and 15pcs per Master Carton)(i.e., for completely assembled C-1001s).

112.     Mele replied to the August 26, 2019 email and: 1) stated that it "can not accept/confirm it at this time, as the price will be different;" 2) requested the contact information for all suppliers of the floats and flags, with prior invoices; and 3) indicated that he was going away and would not have a price until mid-September."

113.     After continued delay, Flanagan wrote to Mele on September 25, 2019 and asked him to provide W&P with the "boards and bodies (including the lens, cup with catalyst and contractor)" so that W&P could assemble the components.

114.     In a reply email of same date to Flanagan's September 25, 2019 email, Mele refused to provide the products and stated that the only way they would continue providing the C-1001 to W&P was if they provided "finished product

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

pricing" despite the fact that they had never operated in this manner in the nearly four years of Weems/W&P's and Tektite's business relationship.

115.   On September 27, 2019, W&P supplied Mele with the names of its suppliers in an attempt to get a finished product price.

116.   On October 8, 2019, when Flanagan emailed Mele to follow-up, he said "I have not received any responses to my Sept. 27 RFQs to the 2 vendors. This is not entirely unexpected due to the holiday week in China."

117.   When W&P followed up with one of the Chinese suppliers, Pan-U Ind. Co. Ltd ("Pan-U"), it was informed on October 13, 2019 that it had never received a request or RFP from Mele or Tektite.

118.   Upon information and belief, Mele wrote literally false statements to W&P for the purpose of deceiving it into believing it was working on a quote when in fact it was not, to delay production of the C-1001 and to avoid W&P finding another supplier because Mele and Tektite were conspiring with at least the Sirius Defendants to divert all of W&P's customers to Sirius by depleting the inventory of W&P by refusing to manufacture the C-1001.

119.   Upon information and belief, in furtherance of Covelli's and Sirius's activities to manufacture the Licensed Products, and in breach of the Agreement, Covelli placed an order with Tektite for the same components that W&P had ordered from Tektite.

120.   Flanagan had sent a letter to Mele and Tektite on August 7, 2019 advising them that such activities (i.e., manufacturing the C-1001 or components thereof for Sirius) would be a violation of W&P's rights, and asked Mele to notify him of any such activities. Upon information and belief, Mele did not notify Flanagan and instead proceeded to fill the order placed by the Sirius Defendants behind the back of W&P.

/ /

/ /

121. Upon information and belief, Covelli is a close acquaintance of Mele, and Mele, Tektite, or both have a financial interest in Sirius and/or the profitability of the C Series Lights.

122. Upon information and belief, at least Covelli conspired with Mele and Tektite and exerted inappropriate influence on them to interfere with W&P's order for the C-1001.

123. At least on October 5, 2019, at least Covelli and Sirius made statements to Mele and Tektite that were literally false or likely to mislead, confuse or deceive regarding W&P's rights to manufacture the Licensed Products, and Covelli's and Sirius's statements caused commercial injury to W&P by harming W&P's ability to manufacture, and therefore sell, the C-1001, including, at a minimum, introducing inappropriate competition from Sirius in breach of W&P's Exclusive Rights under the Agreement.

124. Because of Covelli's inappropriate influence on Tektite, Tektite refused to do business with W&P on its regular terms and greatly increased the cost to W&P for supplying the C-1001.

125. Without the additional C-1001 supply, W&P was limited in W&P's ability to manufacture and sell the C-1001, including sale of its C-1001 inventory during the Sell-Off Period (as defined below).

**(3)    Customer A.**

126. Weems/W&P have been selling the C-1001 to Customer A since around 2015. Weems/W&P have had business and contractual relations with Customer A since at least the middle of the 1970s, and W&P reasonably has an expectation of ongoing prospective business and contractual relations with Customer A. Customer A is representative of W&P's customers similarly impacted by the Defendants', which have put W&P's customers in the middle of the dispute between the Plaintiff and Defendants.

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

127.     Prior to August 25, 2019, Covelli informed Customer A that Customer A would no longer be able to obtain the Licensed Products from W&P and that Customer A would need to buy from Sirius the Licensed Products manufactured by Sirius.

128.     Covelli's assertion to Customer A is untrue.  Covelli's untrue comments to at least Customer A constitute fraud, deceit, trickery, bad faith, and/or unfair methods.  Upon information and belief, Covelli made to Customer A statements that were literally false and/or likely to mislead, confuse or deceive regarding W&P's rights to manufacture the Licensed Products, and Covelli's statements caused commercial injury to W&P by harming W&P's ability to sell the C-1001 and potentially other products to Customer A, including introducing inappropriate competition from Sirius in breach of W&P's Exclusive Rights.

129.     Even if the Defendants contend that the Agreement ended on August 25, 2019, Section 11 of the Agreement states that: "Upon the termination or expiration of this Agreement for whatever reason, W&P … shall be able to continue to sell, on a non-exclusive basis, existing Licensed Products [in] inventory…." This period is defined herein as the "Sell-Off Period."

130.     Covelli's and Sirius's actions caused at least Customer A to stop buying the Licensed Products from W&P, causing W&P to lose existing and future sales to at least Customer A of the Licensed Product and potentially other products. Customer A has indicated to W&P that so long as there is a dispute over whether W&P has the right to manufacture and sell the Licensed Products, Customer A will not buy the Licensed Products from W&P or Sirius, however, upon information and belief, Customer A has continued to purchase eVDSDs from Orion.

/ /

/ /

/ /

/ /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

# COUNT I
## BREACH OF CONTRACT
## (PLAINTIFF AGAINST THE SIRIUS DEFENDANTS)

131.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

132.     The Agreement between W&P and Sirius is a contract and forms the basis of a contractual relationship between W&P and the Sirius Defendants.

133.     The Sirius Defendants and Weems/W&P, for valuable consideration, entered into an Agreement on December 31, 2015 (with three subsequent amendments) to grant Weems/W&P "an exclusive license … in and to the Know-How with respect to the Patents and the Trademarks to manufacture, distribute, advertise, publicize, market and sell Licensed Products to consumers and retail entities" in return for the Agreement Payments from Weems/W&P to Sirius.

134.     As set forth herein with reference to specific sections of the Agreement, the Sirius Defendants have breached numerous provisions of the Agreement as set forth in this section, causing damage to W&P financially and non-monetarily including, at a minimum, W&P's reputation and W&P's goodwill.

135.     Pursuant to the Third Amendment that Covelli personally signed, Covelli personally bound himself and Simons by the Agreement and made the Agreement binding on him and Simon, by virtue of Covelli and Simons being any of a "legal representatives … owners … members" of Sirius.

136.     As members and owners of Sirius, Covelli and Simons are not employees of Sirius, Covelli and Simons are distinct from the legal entity Sirius, and Covelli, Simons, and potentially others have used Sirius to act as their agent in conduct described herein.

137.     Being personally bound by the Agreement, Covelli and Simons have breached the Agreement with W&P, as individuals, and through the intentional and improper actions of Sirius as Covelli's and Simons' agent and of Covelli and

Simons on behalf of and/or in concert with Sirius, described above with respect to at least Orion, Emlinq, and Customer A and the breaches set forth below.

138.　　Covelli's and Simons' actions as individuals, and through the intentional and improper actions of Sirius as Covelli's and Simons' agent and of Covelli and Simons on behalf of and/or in concert with Sirius described above, have violated W&P's rights under the Agreement and impaired W&P's ability to obtain the full benefits of the Agreement.

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING OF THE AGREEMENT

139.　　The Sirius Defendants breached an implied covenant of good faith and fair dealing by knowingly misrepresenting that the C-1001 was patented, in order to induce Weems/W&P to execute and perform the Agreement, including Weems/W&P making Agreement Payments for sales of the Licensed Products.

140.　　The Sirius Defendants breached an implied covenant of good faith and fair dealing by knowingly misrepresenting that patents obtained, owned, and/or claimed to be owned by Sirius were valid when, in fact, it knew that they were invalid due to fraud, inequitable conduct, and violation of the duty to disclose material art to the USPTO.

141.　　The Sirius Defendants have breached an implied covenant of good faith and fair dealing by threatening to not renew the Agreement if W&P did not license a new, multi-colored light and pay a significant upfront payment of $275,000 (in addition to the initial upfront payment of $200,000 paid for the initial Agreement).  Assuming arguendo that Sirius's claim is correct that the multi-color light is not a Licensed Product covered under the Agreement, Sirius breached its duty of good faith and fair dealing regarding the Agreement by improperly attempting to tie continuation of the existing Agreement to W&P's acceptance of the newly-proposed license agreement to the multi-colored light.  Nothing in the / /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

Agreement requires W&P to license new products as a condition to continuing to license the existing products.

142.     Conversely, assuming, as W&P does, that that the multi-color light is a Licensed Product covered under the Agreement, the Sirius Defendants breached its duty of good faith and fair dealing regarding the Agreement by improperly attempting to tie continuation of the existing Agreement to W&P's acceptance of the newly-proposed, unnecessary, and exorbitant license agreement to the multi-colored light, for which W&P already has a license under the Agreement.  Beyond improperly attempting to tie continuation of the Agreement to acceptance of the unnecessary license, Sirius's demand that W&P pay an extra exorbitant upfront fee to license the new multi-color light is in breach of good faith and fair dealing, because the multi-colored light falls under the definition of Licensed Products, is thus already part of W&P's License, for which a previous upfront fee already had been paid, and pursuant to which royalties on sales of the multi-colored light would accrue on behalf of Sirius just as sales of the existing products do already.

143.     The Sirius Defendants also breached an implied covenant of good faith and fair dealing by fabricating the unsubstantiated claim that W&P breached the Agreement as a basis for its Second Declaration of Intent to End Agreement. The Sirius Defendants only made this claim after the Sirius Defendants realized that they had no legal justification for the First Declaration of Intent to End Agreement, and the First Declaration of Intent to End Agreement was sent to W&P only after and because W&P declined to accept Sirius's demands that W&P enter into a separate license agreement for the new multi-color light and pay an enormous upfront fee, which is not a valid basis for terminating the Agreement.

### BREACH OF SECTION 2 OF THE AGREEMENT

144.     Under Section 2a of the Agreement (listed as Section 3 in the First Amendment to the Agreement, but still referred to as Section 2 within the amended section), W&P has the exclusive right to "manufacture, distribute, advertise,

publicize, market, sell, offer for sale and/or import Licensed Products" which is a part of W&P's Exclusive Rights.

145.      In breach of W&P's Exclusive Rights under the Agreement, prior to August 25, 2019, at a minimum, the Sirius Defendants undertook activities to manufacture the Licensed Products by, at a minimum, the Sirius Defendants having ordered floats from one of W&P's suppliers, Pan-U, for use in Tektite's manufacturing of the Licensed Products.

146.      In further breach of W&P's Exclusive Rights by the Sirius Defendants, prior to August 25, 2019, Sirius contacted third parties, including but not limited to, Emlinq to manufacture circuit boards for the Licensed Products for Sirius, for use in Tektite's manufacturing of the Licensed Products.

147.      In further breach of W&P's Exclusive Rights by the Sirius Defendants under the Agreement, Sirius has been marketing Sirius-manufactured Licensed Products to at least one of W&P's customers, including Customer A, in an attempt to divert sales from W&P to Sirius and make direct sales to these customers of Licensed Products.  Customer A is representative of W&P's customers similarly impacted by the Defendants' activities, which have put W&P's customers in the middle of the dispute with Plaintiff and Defendants, thereby damaging W&P's goodwill and reputation.

148.      In further breach of W&P's Exclusive Rights by Sirius under the Agreement, on August 26, 2019, Sirius published a press release announcing, "the upcoming launch of its dual color eVDSD model C-1002 device and the updated C-1003 model, both of which will be manufactured and distributed exclusively by Sirius Signal." The press release continues that these models "are currently undergoing testing and certification."

149.      The C-1002 and C-1003 devices are Licensed Products in accordance with the terms of the Agreement.

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

150.    In further breach of W&P's Exclusive Rights by Sirius under the Agreement, the Sirius Defendants offered and continue to offer C-1003s for sale, and, in doing so, disparage the C-1001 sold by W&P by marketing the new model C-1003 as a replacement that "promises to be vastly more effective than the current white light models," wherein the current white light models are the C-1001 sold by W&P.  As such, the Sirius Defendants are implying that the W&P C-1001 product is outdated, inferior, and less effective.  Even if the Agreement is deemed to have an early termination date, the Sirius Defendants are well aware that these statements affect the ability of W&P to sellout its inventory during the Sell-Off Period as per the terms of the Agreement.

151.    Section 2a of the Agreement also states that "Sirius shall in a timely manner make available to W&P such materials as may be necessary or desirable for use in exercising W&P's rights hereunder."

152.    In breach of these express terms of Section 2a of the Agreement, in an attempt to frustrate W&P's ability to manufacture the products, Emlinq and the Sirius Defendants have refused, and continue to refuse, to provide manufacturing specifications for the Licensed Products to W&P, including, but not limited to, circuit board design specifications, known as "Gerber" files ("Gerber Files"), which are necessary to manufacture the circuit boards.

**BREACH OF SECTION 3 OF THE AGREEMENT**

153.    Section 3 of the Agreement states, in part, that "[t]he parties agree to renew for additional twenty-four (24) month periods thereafter … unless one party after a mandated negotiation at the end of the prior term gives the other party sixty (60) days' notice to terminate the Agreement. In this way, the License could be for the life of the patents…."

154.    The Agreement was amended in Section D of the Third Amendment to state that the Agreement "will automatically renew" unless intentionally terminated by 60-days' notice and only then, after a "mandated negotiation."

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

Section 2 of the Third Amendment states that "prior to renewal of a 'Term' in Section 3 under the Agreement, in order to terminate the 'Initial Term' or a 'Renewal Term', the 'mandated negotiation' prior to the termination must occur at least sixty (60) days prior to the end of the 'Term', and each party must give the other party sixty (60) days [sic] notice to terminate the 'Term' prior to the end of each 'Term', unless agreed by the parties in writing."

155.    In breach of these express terms of the Agreement, Sirius violated Section 3 of the Agreement by not performing the required "mandated negotiation" prior to declaring the termination of the Agreement.

### BREACH OF SECTION 5 OF THE AGREEMENT

156.    Section 5 of the Agreement states that "Sirius will not license to any party other than W&P, to manufacture, sell or distribute any products that perform the same or a substantially similar function as the Licensed Products."

157.    In breach of Sirius's obligations under Section 5, Sirius negotiated with at least one third party, Orion to license the Sirius IP to Orion.

158.    In breach of Sirius's obligations under Section 5, Sirius negotiated with at least Orion to license the new multi-colored light.

159.    In breach of Sirius's obligations under Section 5, Sirius gave at least Orion an implied license to sell Licensed Products by not enforcing the patents against Orion.

160.    In breach of these express terms of the Agreement, Sirius has thus effectively licensed rights to manufacture and sell the Licensed Products to Orion by failing to enforce the Sirius IP, and has not decreased the cost paid by W&P to Sirius accordingly despite the fact that W&P effectively had a non-exclusive license to manufacture and sell the Licensed Products since the introduction of the Orion Kit in 2018.

/ /

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

## BREACH OF SECTION 6 OF THE AGREEMENT

161.     Section 6 of the Agreement gives W&P a Right of First Offer to any new technologies or products developed by the Sirius Defendants that are not Licensed Products.

162.     Upon information and belief, Sirius negotiated with Orion to make the multi-colored light before offering to W&P the opportunity to make the multi-colored light.  If for any reason the multi-colored light is not considered to be a Licensed Product, then the Sirius Defendants are in breach of the express terms of the Agreement, because the Sirius Defendants negotiated with at least Orion to license, implicitly or explicitly, the new, multi-colored light without first offering such opportunity to W&P.  Even when the Sirius Defendants eventually did offer the new product to W&P, the Sirius Defendants did so without providing support for projected sales or other material information, such as estimated manufacturing costs, which would be critical for W&P to make an informed decision.  The Sirius Defendants then retracted the offer while refusing to provide the additional information, thereby further depriving W&P of its right of first offer.

163.     Upon information and belief, in breach of the express terms of the Agreement, the Sirius Defendants negotiated with at least Orion to license, implicitly or explicitly, certain Know How without first offering such opportunities to W&P.

## BREACH OF SECTION 8(C) OF THE AGREEMENT

164.     Section 8c of the Agreement obligates Sirius to take diligent steps to enforce the Patents against third parties.

165.     Section 8c of the Agreement states, in part: <u>Defense of Patents and Trademarks</u>. In the event either party becomes aware of any infringement by a third party of the Patents or Trademarks, Sirius shall, at its sole cost and discretion, take diligent steps, including, but not limited to, filing a lawsuit or injunction if necessary, to protect and defend Sirius's rights to the Patents and trademarks.

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

166.     Upon information and belief, at least Orion is selling a product that Sirius indicates infringes at least one claim of one of the Patents.

167.     Orion's purported infringement of the Licensed Patents has been ongoing since on or about May 2018.

168.     W&P notified Sirius that such infringement was causing financial harm to W&P.

169.     W&P put Sirius on notice of the financial damage caused by Orion's purported infringement at least as early as October 2018.

170.     Upon information and belief, and in breach of the express terms of the Agreement, Sirius has not "take[n] diligent steps, including, but not limited to, filing a lawsuit or injunction if necessary," to prevent Orion from infringing the Licensed Patents.

171.     In breach of the express terms of the Agreement, Sirius has not brought a lawsuit against Orion or any other third party to prevent them from infringing the Licensed Patents.

172.     One of the benefits of the Agreement obtained by W&P in exchange for the Agreement Payments  is the exclusive right to manufacture, distribute, advertise, publicize, market, and sell the Licensed Products.

173.     Section 2a of the Agreement states that "Sirius understands and agrees that the representations and warranties set forth in this Section 2(a) are a material inducement to W&P entering into this Agreement."

174.     W&P has been damaged financially by Sirius not enforcing the Licensed Patents against Orion in the form of, at a minimum, lost sales.

175.     To the contrary, in clear breach of Sections 2a and 8c of the Agreement, Sirius is actively encouraging Orion to infringe the Patents by negotiating a license to the Sirius IP with Orion.

/ /

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

176.     Sirius's failure to "take diligent steps … to protect and defend Sirius's rights to the Patents" to the clear disadvantage of W&P also breaches Sirius's duty of good faith and fair dealing.

### BREACH OF SECTION 10 OF THE AGREEMENT

177.     Section 10 of the Agreement provides a minimum of a 30-day window to cure any breach to the Agreement.  The minimum window to cure is 30 days, except in the case that the breach "is not capable of reasonably being cured within thirty (30) days." In such instance, the time for cure "shall be extended as reasonably necessary provided the defaulting party commences to cure such default within thirty (30) days and diligently prosecutes the cure to completion." Likewise, nowhere does the Agreement provide Sirius with the right to unilaterally terminate either: (1) based on Sirius's unilateral perception that an alleged breach is "incapable of being cured;" or (2) before at least 30 days of notice have passed and the alleged breach has not been cured or corrected or begun to be cured or corrected.

178.     In the Second Declaration of Intent to End Agreement, Sirius stated that W&P allegedly had breached of the Agreement by selling to a distributor in Finland the Licensed Products with a red light that does not conform to USCG standards and by labeling these products with the same product number as those sold with a white light that does conform to USCG standards, despite the fact that Sirius, after extensive communications with W&P, approved the sale of this exact light to the Finnish distributor.

179.     In the Second Declaration of Intent to End Agreement, Sirius first instructed W&P, in three enumerated commands, to "Take all steps necessary" to cure specified aspects of the alleged breach.  Immediately thereafter, Sirius illogically, and in contradiction to the three enumerated commands, asserted that "[b]y their very nature, these breaches of the agreement are incapable of being cured, much less cured within 30 days or within a reasonable time period."

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

Sirius's own enumerated commands set forth how Sirius would propose to cure the alleged breaches, directly undermining and contradicting Sirius's claim that such "breaches of the agreement are incapable of being cured," clearly demonstrating, *inter alia*, Sirius's lack of good faith, in breach of Sirius's duty of good faith and fair dealing, and Sirius's breach of the cure provisions of Section 10.  Sirius's assertion of the unilateral discretion to deem an alleged breach to be "incapable of being cured" is itself a breach of the Agreement, as is Sirius's assertion that Sirius unilaterally may terminate the Agreement based on Sirius's perception of an alleged breach being "incapable of being cured."

180.     In addition to Sirius's breach of the Section 10 cure provisions, Sirius also fabricated the breach allegations by basing the unsupported allegations on illusory references to aspects of the Agreement.  In contradiction to Sirius's breach allegations, there is no express provision in the Agreement or in any other documentation that the Licensed Products are required to have a white light or to conform to USCG standards.

181.     There also is no requirement in any of the Sirius IP that the products described therein must have a white light or conform to USCG standards.

182.     Furthermore, Sirius approved the Finnish Light prior to the shipment of the Finnish Light to Finland.

183.     Nevertheless, although not in breach of the Agreement, in a sign of good faith, W&P submitted a plan to Sirius to address Sirius's concerns within the thirty-day cure period.

184.     In breach of the express terms of Section 10 of the Agreement, through the Second Declaration of Intent to End Agreement, Sirius is attempting to terminate the Agreement early, even though W&P had cured, or had commenced to cure, any alleged breach within 30 days of notification, and even though the breach allegations are not supported by any express terms of the Agreement, and as such, no express terms of the Agreement were breached.

185.     W&P has complied with its obligations under the Agreement. Nonetheless, Sirius has interfered with W&P's sales of the Finnish Light and W&P's relationships with W&P's customers purchasing the Finnish Light.

186.     The Sirius Defendants' tortious actions in breach of the Agreement have damaged or will damage W&P financially in an amount exceeding $75,000.

## COUNT II

## UNFAIR COMPETITION

## (PLAINTIFF AGAINST ALL DEFENDANTS)

187.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

188.     Through the actions set forth above with respect to at least Orion, Emlinq, and Customer A, Defendants have damaged, impaired, and/or jeopardized W&P's business through fraud, deceit, trickery, bad faith, and/or unfair methods. Upon information and belief, Defendants committed unfair competition inasmuch as: (1) Covelli personally interfered with the fulfillment of an order for five thousand (5000) circuit boards to be manufactured by Emlinq for W&P; (2) Emlinq refused to provide the circuit boards to W&P and instead provided circuit boards to Sirius in violation of the Agreement; (3) Mele and Tektite refused to provide C-1001s to W&P in accordance with their previously negotiated terms;; (5) the Sirius Defendants issued a press release on August 26, 2019 that was literally false and/or likely to mislead, confuse or deceive by leading consumers to believe that the Agreement had expired; (6) the Sirius Defendants issued a press release on October 22, 2019 that was literally false and/or likely to mislead, confuse or deceive stating that effective Jan 1, 2020, Sirius Signal will no longer license or manufacture the model C-1001 and indicating that the "C-1003 will be available as a direct replacement for the light you currently carry";  and (7) at least these actions of the Defendants caused commercial injury to W&P by harming W&P's ability to manufacture and sell, the C-1001 during a time in which neither

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

party disputes that the Agreement was in full force and effect and during the Sell-Off Period, such action including introducing inappropriate competition from Sirius in breach of W&P's Exclusive Rights under the Agreement.

189.     Due to the untrue communications to Customer A, and these Customers' reliance thereon, and the inability of W&P to manufacture and sell the C-1001 product, W&P's ability to: 1) sell the C-1001 to Customer A has been impaired; and 2) sell other products to Customer A has been jeopardized, because the inappropriate uncertainty caused by the Sirius Defendants' untrue communications has undermined these Customers' faith in W&P as a supplier.

190.     Also due to these untrue communications to Customer A and the Customers' reliance thereon, and the inability of W&P to manufacture and sell the C-1001 product, W&P's reputation and goodwill in the perspective of Customer A have been damaged by Defendants' actions, because Defendants' untrue communications have undermined these Customers' faith in W&P in general.

191.     The Defendants' tortious actions have financially damaged W&P in an amount exceeding $75,000.

## COUNT III

## TORTIOUS INTERFERENCE WITH
## PROSPECTIVE BUSINESS ADVANTAGE
## (PLAINTIFF AGAINST ALL DEFENDANTS)

192.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

193.     Defendants' actions described above have impaired W&P's ability to reliably and predictably obtain the circuit boards from Emlinq and the C-1001s from Tektite.

194.     When W&P is not able to obtain the circuit boards and the C-1001s, W&P is unable to manufacture the C-1001.  Therefore, Defendants' actions have impaired W&P's ability to reliably and predictably manufacture the C-1001,

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

thereby damaging W&P's ability to sell the C-1001 and exercise W&P's Exclusive Rights under the Agreement.

195. Defendants' actions described above were performed intentionally and were reasonably calculated to cause damage to W&P's business. W&P has had ongoing business relations with Emlinq and Tektite, and but for Defendants' interference, W&P has had a reasonable probability of ongoing and future business opportunities with Emlinq and Tektite.

196. Defendants' actions described above with respect to Emlinq and Tektite were done with the unlawful purpose to cause damage and loss to W&P, without right or justifiable cause.

197. W&P has been damaged financially and reputationally from Defendants' actions described above with respect to Emlinq and Tektite.

198. Due to Defendants' actions described above, W&P's ability to sell the C-1001 to its customers including, without limitation, Customer A has been impaired.

199. Due to Defendants' actions described above, W&P's ability to sell other products to its customers including, without limitation, Customer A has been jeopardized.

200. Defendants' actions described above with respect to Emlinq, Tektite, and Customer A were performed intentionally and were reasonably calculated to cause damages to W&P's business. W&P has had ongoing business relations with Customer A, and but for Defendants' interference, W&P has had a reasonable probability of ongoing and future business opportunities with at least Customer A.

201. Defendants' actions described above with respect to Customer A were done with the unlawful purpose to cause damage and loss, without right or justifiable cause.

202. W&P has been damaged financially and reputationally from Defendants' actions described above with respect to at least Customer A.

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

1    203.    Defendants' actions with respect to at least Emlinq and Customer A

2  were wrongful or unlawful because they frustrated W&P's ability to perform

3  W&P's Exclusive Rights under, and obtain the benefit of, the Agreement, to which

4  Covelli and Simons personally bound themselves explicitly in the Third

5  Amendment, and they breached an implied covenant of good faith and fair dealing.

6    204.    The Defendants' actions were additionally wrongful or unlawful

7  because they breached Section 2 of the Agreement by: (1) violating W&P's

8  exclusive license to advertise, publicize, market or sell the C-1001 to at least

9  Customer A; and (2) attempting to advertise, publicize, market or sell to at least

10  Customer A Licensed Products not purchased from W&P for resale.

11    205.    Defendants' actions intentionally have interfered tortiously with

12  W&P's business and contractual relations with Emlinq, Tektite, and at least

13  Customer A.  Defendants' actions intentionally have interfered tortiously with

14  W&P's prospective business advantage with at least Customer A.  Namely,

15  Defendants' actions have proximately caused W&P's ability to manufacture and

16  sell the Licensed Products to decrease and have damaged W&P at least in terms of

17  lost current and future sales, decreased product turnover, and associated decreased

18  profits. Due to Defendants' tortious interference, W&P has been damaged

19  financially and reputationally in W&P's existing and prospective business

20  relationships with Emlinq, Tektite, and at least Customer A.

21    206.    Defendants committed tortious interference with W&P's business

22  relations inasmuch as: (1) W&P had beneficial business relations with at least

23  Customer A, Emlinq, and Tektite; (2) Defendants' knew of W&P's beneficial

24  business relations; (3) Defendants' intended to impair or cause a detriment to

25  W&P's business relations; (4) Defendants' lacked any privilege to impair or cause

26  a detriment to W&P's business relations; (5) Defendants' impaired or caused a

27  detriment to W&P's business relations; and (6) Defendants' actions caused damage

28  to W&P.

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

# COUNT IV

## CIVIL CONSPIRACY BY DEFENDANTS

### (PLAINTIFF AGAINST ALL DEFENDANTS)

207.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

208.     Upon information and belief, Sirius was formed by Covelli and Simons in California on March 05, 2015 and identified as entity 201506810315.

209.     Upon information and belief, no legal entity possibly associated with Sirius is known to have existed prior the formation of Sirius on March 05, 2015.

210.     Upon information and belief, Sirius has as members, *inter alia,* Covelli and Simons, who are the co-inventors listed on Sirius IP covered in the Agreement executed by Covelli on behalf of Sirius.

211.     Upon information and belief, co-inventors Covelli and Simons claim to have created the initial devices and initial technology associated with the Sirius IP, the earliest of which was filed June 06, 2014, at least nine months before the formation of Sirius as a legal entity on March 05, 2015.

212.     Upon information and belief, co-inventors Covelli and Simons initially owned the Sirius IP by act of law upon filing of the associated patent applications, in the absence of any written assignment assigning ownership thereof to a third party.

213.     Upon information and belief, co-inventors Covelli and Simons executed on April 06, 2016, and recorded with the United States Patent and Trademark Office ("USPTO") on June 11, 2018, a written assignment purporting to assign the '114 Patent to "Sirius Signal Co." of 1042 North El Camino Real, Suite B-200, Encinitas, CA 92024.  The '114 Patent is based on U.S. Patent Application 16004987 filed on June 11, 2018.

214.     Upon information and belief, co-inventors Covelli and Simons, executed on April 06, 2016, and recorded with the USPTO on April 11, 2016, a

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

written assignment purporting to assign the '754 Patent to "Sirius Signal Co." of 1254 Scott Street, San Diego, CA 92106. The '754 Patent is based on U.S. Patent Application 15095727 filed on April 11, 2016.

215. Upon information and belief, co-inventors Covelli and Simons, executed on February 25, 2016, and recorded with the USPTO on March 07, 2016, a written assignment purporting to assign the '175 Patent to "Sirius Signal Co." and identified in the USPTO Assignment Records as "Asirius Signal Co." of 1254 Scott Street, San Diego, CA 92106. The '175 Patent is based on U.S. Patent Application 29557241 filed on March 07, 2016.

216. Upon information and belief, co-inventors Covelli and Simons, executed on February 25, 2016, and recorded with the USPTO on March 02, 2017, a written assignment purporting to assign the '920 Patent to "Sirius Signal Co." of 1254 Scott Street, San Diego, CA 92106. The '920 Patent is based on U.S. Patent Application 29595834 filed on March 02, 2017.

217. Upon information and belief, co-inventors Covelli and Simons, executed on January 05, 2019, and recorded with the USPTO on January 24, 2019, a written assignment purporting to assign the '477 Patent to "Sirius Signal, LLC" of 1042 North El Camino Real, Suite B-200, Encinitas, CA 92024. The '477 Patent is based on U.S. Patent Application 29638591 filed on February 28, 2018.

218. Upon information and belief, co-inventors Covelli and Simons, executed on April 06, 2016, and recorded with the USPTO on June 15, 2017, a written assignment purporting to assign the '033 Application, published as U.S. Patent Publication 20170349248, to "Sirius Signal Co." of 1254 Scott Street, San Diego, CA 92106. The '033 Application was filed on June 15, 2017.

219. Upon information and belief, co-inventors Covelli and Simons, executed on April 06, 2016, and recorded with the USPTO on January 11, 2019, a written assignment purporting to assign the '947 Application, published as U.S. Patent Publication 20190161149, to "Sirius Signal Co." and identified in the

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

USPTO Assignment Records as "Sirius Signal, LLC" of 1042 North El Camino Real, Suite B-200, Encinitas, CA 92024.  The '947 Application was filed on January 11, 2019.

220.     Under California Code of Regulations (CCR) section 21001(d)(1)(B)&(G), the unitary business entity identifiers "Co." and "Company" apply only to corporations, and not to limited liability companies, in the absence of the words or abbreviations for "limited" and "liability."

221.     Upon information, belief, and a diligent search, "Sirius Signal Co." does not exist as a legal entity in California or elsewhere.

222.     Upon information, belief, and a diligent search, "Sirius Signal, Inc." does not exist as a legal entity in California or elsewhere.

223.     Upon information and belief, the patent assignments purporting to assign patents and patent applications to "Sirius Signal Co." are legal nullities and void, because "Sirius Signal Co." does not exist, either as a legal entity or as an assignee, and thus cannot own the purported assigned patents and patent applications.  Therefore, co-inventors Covelli and Simons retained their ownership of the assets purportedly assigned to "Sirius Signal Co." and remained the owners of those assets through at least 12/31/2019.

224.     Upon information and belief, co-inventors Covelli and Simons, know that "Sirius Signal Co." does not exist, and Sirius , as a legal entity, knows that "Sirius Signal Co." does not exist, at least by virtue of Covelli knowing that "Sirius Signal Co." does not exist.

225.     Upon information and belief, at least the Sirius Defendants knew that Sirius did not own at least a portion of the Sirius IP covered in the Agreement during the term of the Agreement and intentionally misrepresented to Weems/W&P that Sirius owned all of the Sirius IP.

226.     Upon information and belief, at least Covelli and Sirius intentionally misrepresented to Weems/W&P that the C-1001 was patented.

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone:  (310) 388-4849

COMPLAINT
CASE NO.:                                                - 47 -

227.     Upon information and belief, at least Covelli and Sirius intentionally misrepresented to Weems/W&P that it should falsely mark the products with the numbers of patents that did not cover the product.

228.     Upon information and belief, at least Covelli and Sirius intentionally misrepresented to Weems/W&P that patents obtained, owned, and/or claimed to be owned by Sirius were valid when, in fact, the Tektite/Sirius Defendants knew that they were invalid due to obviousness, fraud, inequitable conduct, inventor misrepresentation, submission of fraudulent statements to the USPTO, and violation of the duty to disclose material art to the USPTO.

229.     Upon information and belief, the Tektite/Sirius Defendants were all aware of the duty to provide all relevant material art to the USPTO, and Covelli and Simons signed a declaration that they would do so, and in violation of that declaration, both inventors intentionally failed to disclose at least the "Material Information" to the USPTO.

230.     In executing and purchasing the Agreement, Weems and W&P, respectively, detrimentally relied on at least Covelli's and Sirius' misrepresentation and omission of these material facts relating to the inventorship, ownership, scope, and validity of the Sirius IP, and in performing under the Agreement, Weems' and W&P's detrimental reliance on at least Covelli's personal material misrepresentations and omissions caused Weems and W&P to incur monetary damage by paying substantial Agreement Payments to license from Sirius the Sirius IP that is invalid, unenforceable, does not cover the distributed product, and a portion of which is not owned by Sirius.

231.     When W&P refused to pay an additional exorbitant licensing fee to the Sirius Defendants to license its new C-1002 light, the Tektite/Sirius Defendants conspired with Emlinq to stop W&P's production of the C-1001 light so that the Defendants could, *inter alia,* profit from the increase in sales of the C-1002 and C-
/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

1003 products either directly or in the form of being paid for an increase in production of the C-1001s or components thereof.

232.     As set forth above in the Facts section, Emlinq intentionally and knowingly denied a circuit board order placed by W&P after nearly four years of supplying circuit boards to W&P for the sole purpose of conspiring with the other Defendants to disrupt W&P's sale of the C-1001 Product.

233.     Emlinq further refused to supply W&P with the Gerber Files to allow them to place its circuit board order with another supplier despite Flanagan emailing Emlinq on August 2019 and demanding that Emlinq "immediately provide me all design files for the board."

234.     As set forth above in the Facts section, Mele and Tektite intentionally and knowingly delayed, raised the price of, and then denied a C-1001 order placed by W&P after nearly four years of supplying C-1001s to W&P for the sole purpose of conspiring with the other Defendants to disrupt W&P's sale of the C-1001 Product.

235.     Upon information and belief, Mele and Tektite also conspired to hide the fact that Mele or another individual associated with Tektite developed and invented the C-1001 from the USPTO, Weems, and W&P, to allow the Sirius Defendants to fraudulently re-patent the technology of its expired '288 Patent.

236.     Upon information and belief, the Defendants conspired to commit the Conspiracy Acts and other acts in order to carry out  the Conspiracy as set forth otherwise herein.

237.     Upon information and belief, the Defendants committed the tort of civil conspiracy by: (1) combining or agreeing with a common purpose to commit an unlawful act or do an otherwise lawful act by unlawful means, through the Conspiracy Acts and other overt acts described herein in furtherance of the Conspiracy; (2) committing the overt acts as described herein in furtherance of the common purpose, or Conspiracy; and (3) causing Weems and W&P to incur actual

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

damages, including monetary damages of the Agreement Payments to license from Sirius the Patents that were obtained fraudulently, do not cover the scope of the distributed product, and at least a portion of which are not actually owned by Sirius, as well as lost profits from the inability to manufacture the C-1001 and reputational damage.

### COUNT V

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (PLAINTIFF AGAINST ALL DEFENDANTS)

238.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

239.     The Defendants committed tortious interference with W&P's contractual relations inasmuch as: W&P had beneficial contractual relations and a legally protected interest with at least Customer A (to sell product including the C-1001 thereto), Emlinq (to purchase circuit boards therefrom), Tektite (to purchase assembled C-1001s therefrom), and Sirius (the Agreement), and, upon information and belief, the Defendants knew of W&P's beneficial contractual relations and legally protected interest with each of these parties.

240.     The Defendants intentionally and willfully induced third parties to breach or otherwise render impossible the performance of the contract by: (1) the non-Emlinq Defendants intentionally and willfully conspired to induce Emlinq to refuse W&P's order for 5000 circuit boards;  (2) the non-Tektite Defendants intentionally and willfully conspired to induce Tektite to change the terms of its orders with W&P for the assembled C-1001s, to delay the provision of new terms of orders to W&P for the assembled C-1001s, and to quote unreasonable terms to W&P for orders of the assembled C-1001s; (3) all of the Defendants intentionally and willfully conspired to induce at least Customer A to cease doing business with W&P including, but not limited to, the making of false statements to Customer A, and/or for W&P to be unable to supply at least Customer A with the C-1001; and

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

(4) all of the non-Sirius Defendants intentionally and willfully conspired to (i) deprive W&P of its Exclusive Rights pursuant to the Agreement including, without limitation, its exclusive rights to manufacture and sell the C-1001 and its Right of First Offer and (ii) to induce Sirius to breach the Agreement in multiple ways as set forth herein including, without limitation, breach of the Right of First Offer in its negotiations with Orion for license of the C-1002.

241.    The Defendants lacked any justification or privilege to impair, cause a detriment to, or cause a breach of W&P's contractual relations, and the Third Party Defendants impaired, caused a detriment to, and/or caused a breach of W&P's contractual relations in that W&P could not manufacture circuit boards, W&P could not manufacture C-1001s, W&P could not supply its customers with C-1001s, Sirius attempted to prematurely terminate the Agreement, and W&P's reputation with at least Customer A has been damaged.

242.    The Third Party Defendants' actions caused damage to W&P in the form of lost sales, damage to its reputation, and damaged relationships with at least Customer A.

243.    Due to the Tektite/Sirius Defendants as described above, W&P has been impaired at least in W&P's ability to obtain the full benefits of the Agreement by being unable to reliably and predictability manufacture or sell Licensed Products; and by the premature termination of the Agreement and the relationship with Sirius.

244.    W&P's reputation and goodwill have been damaged by the Defendants' actions.

245.    The Defendants tortious actions have damaged W&P financially in an amount exceeding $75,000.

/ /

/ /

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

## COUNT VI

## FRAUD

## (PLAINTIFF AGAINST TEKTITE/SIRIUS DEFENDANTS)

246.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

247.     Upon information and belief, at least the Sirius Defendants committed the tort of fraud, fraudulent inducement, and/or fraudulent misrepresentation by (1) making false representations to Weems/W&P regarding the validity, scope, ownership, inventorship, and enforceability of the Sirius IP and Licensed Patents; (2) the falsity of the representations regarding the Sirius IP was either known to the Sirius Defendants or the representation was made with reckless indifference to its truth; (3) the misrepresentations were made for the purpose of defrauding Weems/W&P to induce them to execute the Agreement and make the Agreement Payments; (4) Weems/W&P relied on the misrepresentation after receiving the advice of patent counsel, and had the right to rely on them; and (5) Weems/W&P suffered compensable injury as a result of the misrepresentations including damages in the amount of the Agreement Payments, lost profits that W&P would have obtained if it had manufactured its own eVDSD, which it did not do due to the false belief that the eVDSD product it was exclusively licensing was patented, and damage to its reputation.

248.     Upon information and belief, Covelli and Simons knew that Sirius did not own at least a portion of the Sirius IP licensed pursuant to the Agreement during the term of the Agreement and intentionally misrepresented to Weems/W&P that Sirius owned all of the Sirius IP by executing the Agreement which stated that "Sirius is the owner of issued and pending U.S. and foreign patents."

249.     Upon information and belief, Covelli and Simons knew and intentionally misrepresented to W&P that the C-1001 was patented.

250.     Upon information and belief,  Covelli and Simons knew and intentionally misrepresented to W&P that it should falsely mark the C-1001 with the numbers of patents that did not cover the C-1001.

251.     Upon information and belief, Covelli and Simons knew and intentionally misrepresented to W&P that patents obtained, owned, and/or claimed to be owned by Sirius were valid when, in fact, they knew that they were invalid due to fraud, the submission of fraudulent inventorship statements to the USPTO, inequitable conduct, and violation of the duty to disclose Material Information to the USPTO.

252.     Upon information and belief, co-inventors Covelli and Simons were both aware of the duty to provide all relevant material art to the USPTO and signed a declaration that they would do so, and in violation of that declaration, both inventors intentionally failed to disclose at least the Material Information to the USPTO.

253.     The Sirius Defendants led Weems to believe during the negotiations of the Agreement that the C-1001 was covered by the Sirius IP.

254.     As part of Weems' due diligence in evaluating the Sirius IP, on December 13, 2015, Trogdon emailed Covelli to request extensive information regarding the Sirius IP.  In response thereto, Covelli knowingly provided false information to Weems in writing in an email to Trogdon dated December 17, 2015 (the "Due Diligence Email").  Specifically, Weems asked Covelli for the "[n]ame of all associated parties in the design and development" of the C-1001 and Covelli falsely replied in writing with "Anthony Covelli Robert Simons" and did not name Tektite, Mele, nor any other agent or employee of Tektite as an inventor of the C-1001, nor did he name the inventor of the '288 Patent.   Weems also requested "[a]ll documents …related to the development of the product" to which Covelli replied "none" and failed to disclose the '288 Patent or any of the work done by
/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone:  (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

Tektite. This was done despite Mele stating in writing that he is the designer of the C-1001.

255. Upon information and belief, the Sirius Defendants falsely led Weems to believe that the C-1001 was covered by the '247 Patent, the '288 Patent, and the '436 Patent by, at a minimum, falsely marking the C-1001 with these product numbers and agreeing that Weems should also mark the C-1001 with these patent numbers.

256. On December 15, 2015, when asked for marketing material for the C-1001 and presented with "Model C-1001 Patent D720.2475 6,168,288& Pend," Covelli approved the marketing material.

257. The '247 Patent is a design patent that bears little resemblance to the C-1001. Indeed, Covelli, Simons, and Sirius acknowledged this lack of resemblance by later filing a new design patent application that issued as the '175 Patent, which does resemble the C-1001.

258. At the time that Covelli made the misrepresentation to Weems regarding the '288 Patent, the '288 Patent did not cover anything because it had expired on January 28, 2013, for failure to pay maintenance fees, and neither Sirius, Simons, nor Covelli owned the '288 Patent.

259. After pushback regarding the patent markings, on December 30, 2015, the day before the Agreement was executed, Covelli wrote in an email "[t]he device will carry singly the Sirius patent number "9,171,436 [sic]" to intentionally mislead Weems into believing that the C-1001 device was covered by the '436 Patent.

260. Further, the '436 Patent did not pertain to the C-1001 product to be sold in accordance with the Agreement because all of the claims require a "floodable lower compartment." The C-1001 never included any floodable compartment, lower or otherwise, and still does not include such a compartment.

/ /

261.     Covelli and Simons both also signed Declarations (37 CFR 1.63) for Utility or Design Application Using an Application Data Sheet ("Declarations") in their personal capacities as inventors of the Sirius IP.  All Declarations specifically state, "I hereby acknowledge that any willful false statements made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years or both" and "I believe that I am the original inventor or an original joint inventor of a claimed invention in the application."

262.     Upon information and belief, Covelli and Simons committed fraud in execution of all of the Declarations associated with the Sirius IP because Covelli and Simons knew that they were not "the original inventor or an original joint inventor" of the Sirius IP.

263.     The invention disclosed in the Sirius IP includes an On/Off Lens Switch, which is identical or nearly identical to the switch disclosed in the '288 Patent, which lists, on its face, an inventor of Christian P. St. Claire, and which has been assigned to Tektite.

264.     Without discovery, W&P cannot determine the exact date upon which the Sirius Defendants learned of the '288 Patent, but Covelli was aware of the '288 Patent, and its relevance and materiality to the C-1001 product and the Sirius IP, at least as early as December 18, 2015 as evidenced by an email exchange between Trogdon and Covelli that occurred on that same date in which Covelli led Trogdon to believe he should mark the C-1001 product with the '288 Patent (the "288 Email").

265.     The Sirius Defendants were likely aware of the '288 Patent much earlier than December 18, 2015 as Tektite was listed as one of Sirius's distributors on the Sirius Web Site at least as early as August 15, 2015.

266.     Despite having personal knowledge of the '288 Patent and other Material Information relevant to the Sirius IP at least as early as December 18, 2015 and having the knowledge that they did not invent the Sirius IP, Covelli and

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

Simons committed fraud on the USPTO as described in detail in Count IX of this Complaint.

267.     Covelli and Simons committed this fraud personally, as their duty to disclose the Material Information to the USPTO, to disclose true inventorship, and to refrain from submitting false documents to the USPTO, arose in their personal capacities as inventors and did not arise pursuant to their positions within, or ownership of Sirius.

268.     Covelli and Simons retained ownership of the Sirius IP as individuals for months or years after the individual filings thereof, and as such, these omissions and actions occurred in their personal capacities as personal owners of the respective patents and patent applications.

269.     The duty to disclose only pertains to prior art of which the inventors are aware, and Covelli and, upon information and belief, Simons, as individuals, were the only one in a position to know that they had personal knowledge of the '288 Patent and its materiality to the Sirius IP at the time they were obligated to disclose it to the USPTO.

270.     At least Covelli committed fraud in the inducement when negotiating the Agreement with Trogdon.

271.     During negotiation of the Agreement, Trogdon consulted with his intellectual property counsel, Mr. Brian Belles ("Belles"), regarding the patents to be licensed, and Belles raised concerns regarding the enforceability and scope of the '247 and '436 Patents.

272.     Trogdon communicated those concerns to Covelli, who shared them with his patent attorney, Mr. Richard Clarke ("Clarke").

273.     Clarke disagreed with Belles' assessment of the '247 and '436 Patents and emailed Covelli to say that, either way, Clarke was bolstering the Sirius IP through the pursuit of a new continuation-in-part application ("CIP") and a new design patent application which matured into the '754 Patent and the '247 Patent

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

(the "Bolstering Patents").  Covelli shared this information with Trogdon on December 30, 2015 in an attempt to induce Trogdon to execute the Agreement.

274.     Covelli knew that these statements were false at the time they were made as he knew the Bolstering Patents would not bolster the portfolio because they would also be unenforceable due to his and Simons' intended future fraud on the USPTO and the fraudulent statements that Covelli and Simons had submitted, and intended to keep submitting, to the USPTO during prosecution of these Bolstering Patents.

275.     In reliance upon Covelli's fraudulent statements, Trogdon executed the Agreement the very next day on December 31, 2015.

276.     Upon information and belief, Belles had no idea about the fraud being perpetrated on the USPTO by Covelli and Simons and, as such, he was not in a position to counsel Trogdon regarding such fraud.

277.     Weems did not learn that the C-1001 was not protected by any of the Sirius IP until it received an email from Belles on March 4, 2016, but, at this time, Weems believed that the Bolstering Patents would cure this deficiency because Sirius had retained Belles for this purposes.  At this time, Trogdon and Belles were unaware of the fraud on the USPTO and the resulting unenforceability of the Bolstering Patents.

278.     At the time the Agreement was executed on December 31, 2015, Covelli and Simons, and potentially Mele, were the only ones who knew that they had already committed fraud on the USPTO, and that they intended to continue to commit fraud on the USPTO, which rendered the licensed patents unenforceable and would render all future patents unenforceable.

279.     In executing and purchasing the Agreement, Weems and W&P, respectively, reasonably and detrimentally relied on at least the Sirius Defendants intentional misrepresentation of these material facts relating to the scope, validity, and ownership of the Patents.  In performing under the Agreement, Weems/W&P's

detrimental reliance on Covelli's and Simons' material misrepresentations caused Weems/W&P to incur monetary damage by paying substantial Agreement Payments for an exclusive license to Sirius IP that is invalid, unenforceable, does not cover the products distributed under the Agreement, and a portion of which are, or were, not actually owned by Sirius.

280.     The Sirius Defendants entered the Agreement without the intention of delivering an exclusive license to valid, enforceable patents covering the scope of the product to be distributed in accordance with the Agreement. As such, the Sirius Defendants induced Weems/W&P to part with at least the Agreement Payments by means of a promise which Sirius Defendants had no intention or ability to perform.

281.     Weems/W&P had no knowledge of the fraud and reasonably could not have discovered that fraud had been committed in the inducement and on the USPTO until at least November 27, 2020 (the "Fraud Discovery Date") at which time W&P's current intellectual property counsel, Rita Chipperson ("Chipperson"), discovered the '288 Email that disclosed: 1) the existence of the '288 Patent; 2) Covelli's knowledge of the '288 Patent; and 3) Covelli's knowledge of the '288 Patent's materiality to the C-1001 product.  Thereafter, Chipperson cross checked the '288 Email with the prosecution history of the Sirius IP to determine the failure to disclose the '288 Patent to the USPTO, and subsequently notified Flanagan and, therefore, W&P of the fraud.

282.     On the date that the original Agreement was executed, neither Weems nor Belles knew, or reasonably could have known, that the Sirius Defendants had committed fraud in the inducement, fraud on the USPTO and/or that the Sirius Defendants intended to continue committing fraud on the USPTO, thereby rendering the licensed patents unenforceable.

283.     With regards to fraud on the USPTO, the duty to disclose applies only if an inventor is aware of prior art *and* its materiality to the pending patent

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

application, in which case such prior art must be disclosed to the USPTO at any point up until issuance of a patent.

284. Even if Belles had knowledge of the '288 Patent, he would not have known that Covelli had knowledge of the '288 patent and that Covelli knew of the '288 Patents' materiality to the Sirius IP during the time period in which he was required to disclose the '288 Patent to the USPTO.

285. It was reasonable for Trogdon to rely upon the advice of Belles as his intellectual property counsel in assessing the validity of the Sirius IP.

286. After execution of the Agreement, Belles took over prosecution of the Sirius IP and filed Information Disclosure Statements for both the '754 Patent and the '114 Patent on April 11, 2016 and June 11, 2018, respectively, both of which did not include the '288 Patent.

287. Belles also owes a duty of disclosure to the USPTO pursuant to 37 CFR 1.56, and it is unlikely that Belles would not have disclosed the '288 Patent to the USPTO if he was aware of it.

288. Furthermore, fraud in the inducement occurred in the execution of each of the First Amendment, Second Amendment, and Third Amendment, which were executed on February 8, 2016, March 10, 2016, and August 18, 2017, respectively. All of the patents referenced in the Agreement and its amendments are all unenforceable due to the fraud of the Sirius Defendants, and neither Trogdon, Weems, nor W&P were aware of the fraudulent conduct until at least the Fraud Discovery Date.

289. The harm perpetrated by the Sirius Defendants is continuing in nature because Sirius repeatedly received on a monthly basis royalty payments for the licensing of invalid, unenforceable patents up until this Court granted the escrow of such royalties with the Court.

290. Upon information and belief, Tektite and Mele committed the tort of fraud, fraudulent inducement, and/or fraudulent misrepresentations by making

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

false representations to W&P regarding the status of W&P's orders to W&P, (2) the falsity of the representations was either known to Tektite and Mele or the representations were made with reckless indifference to its truth, (3) the misrepresentations were made for the purpose of delaying and preventing W&P from seeking another manufacturer for the C-1001, (4) W&P relied on the misrepresentation and had the right to rely on them, and (5) W&P suffered compensable injury as a result of the misrepresentations including damages in the amount of lost profits due to its inability to manufacture the C-1001 and damage to its reputation in not being able to supply the C-1001 to its customers.

291.     Upon information and belief, the false statements of Mele and Tektite include, but are not limited to, when Flanagan emailed Mele on October 8, 2019 to inquire about the status of his quote, Mele responded on the same day stating "I have not received any responses to my Sept. 27 RFQs to the 2 vendors.  This is not entirely unexpected due to the holiday week in China."  Mele knew this statement was false since, upon information and belief, Mele had never requested the RFQs from China because when W&P followed up with one of the Chinese suppliers, Pan-U, it was informed on October 13, 2019 that it had never received a request or RFP from Mele or Tektite.

**COUNT VII**

**PROMISSORY ESTOPPEL**

**(PLAINTIFF AGAINST THE SIRIUS DEFENDANTS)**

292.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

293.     The Sirius Defendants are liable to W&P for equitable remedies under the doctrine of promissory estoppel because: (1) during negotiations of the Agreement with Weems, (2) Covelli, on behalf of himself personally, Sirius, and Simons, represented and promised that the Agreement "could be for the life of the patents" so long as it was "renewed every 24 months within the 24th month

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

negotiations"; (3) Weems relied on Covelli's representations and promises in executing the Agreement, W&P relied on Covelli's representation in purchasing the Agreement, and both Weems/W&P relied on Covelli's representations in performing under the Agreement; (4) Weems' and W&P's reliance was to W&P's detriment, including payments of the substantial Agreement Payments and lost profits that W&P would have obtained if it had manufactured its own eVDSD, which it did not do due to the false belief that the eVDSD product it was exclusively licensing was patented; (5) Covelli and Simons failed to uphold the representations and promises by terminating the Agreement prior to the expiration of the life of the patents without cause and for fraudulent reasons as otherwise set forth herein including, without limitation, Covelli's actions in breach of Section 6 of the Agreement; and (6) it would be unfair, inequitable, and/or unconscionable for the Sirius Defendants to retain the benefits of the Agreement and/or the benefits of early termination of the Agreement in view of the failure to uphold the representations and promises. Covelli and Simons benefit from the Agreement in light of their ownership interests and the distributions to them personally pursuant thereto.

294.    The Sirius Defendants are liable to W&P for equitable remedies under the doctrine of promissory estoppel, because: (1) during negotiations of the Agreement with Weems, (2) Covelli, on behalf of himself personally, Sirius, and Simons, represented and promised that Sirius would be able to grant, and would grant, to Weems an exclusive license to valid patents under the Agreement, the scope of which would cover the C-1001 product; and (3) Covelli, on behalf of himself personally, Sirius, and Simons, represented and promised that Sirius would maintain the exclusive license via enforcement of the patents licensed under the Agreement; (3) Weems relied on Covelli's representations and promises in executing the Agreement and performing under the Agreement, such performance including payment of significant Agreement Payments, and W&P relied on

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

1   Covelli's representations and promises in purchasing the Agreement and

2   performing under the Agreement, such performance also including payment of

3   significant royalties due to the exclusive license procured under the Agreement; (4)

4   Weems' and W&P's reliance was to Weems and W&P's detriment, including

5   payments of the substantial Agreement Payments and lost profits that W&P would

6   have obtained if it had manufactured its own eVDSD, which it did not do due to

7   the false belief that the eVDSD product it was exclusively licensing was patented;

8   (5) Covelli failed to uphold the representations and promises by failing to provide

9   an exclusive license and by failing to enforce the patents against Orion; and (6) it

10   would be unfair, inequitable, and/or unconscionable for Sirius, or Covelli and

11   Simons (as owners and members of Sirius), to retain the benefits of the Agreement

12   in view of the failure to uphold the representations and promises.

13        295.    Equitable remedies that the Court may award W&P include, but are

14   not limited to: 1) voiding the Agreement; 2) modifying the Agreement; 3)

15   disgorging from the Sirius Defendants and paying to W&P the Agreement

16   Payments, the increased profits obtained by the Sirius Defendants due to the breach

17   of the Agreement, the interference with W&P's ability to manufacture and sell the

18   C-1001, and the early termination of the Agreement; 4) disgorging from the Sirius

19   Defendants the profits of any sale or license of the Sirius IP to any third party in

20   violation of Section 6 of the Agreement; and 5) the profits that accrued to Sirius

21   instead of W&P because W&P refrained from manufacturing its own eVDSD due

22   to the false belief that the eVDSD product it was exclusively licensing was

23   patented; and 6) lost profits from the Sirius Defendants failure to renew the

24   Agreement for the life of the patents.

25   / /

26   / /

27   / /

28   / /

**COUNT VIII**

**UNJUST ENRICHMENT**

**(PLAINTIFF AGAINST THE SIRIUS DEFENDANTS)**

296.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

297.     The Sirius Defendants are liable to W&P for equitable remedies under the doctrine of unjust enrichment, because: (1) Covelli negotiated and executed the Agreement with Weems on behalf of the Sirius Defendants, in which Covelli represented to Weems that Sirius owned valid and enforceable Sirius IP having a scope that covered the C-1001 when Covelli and Simons knew the patents were invalid; (2) Covelli and Sirius purported to grant to Weems/W&P an exclusive license to the Sirius IP, in exchange for the Agreement Payments, and then failed to take diligent steps to enforce the Sirius IP against Orion; (3) the Sirius Defendants attempted to sell the Sirius IP, or a portion thereof, to Orion without offering the opportunity to W&P in violation of W&P's Right of First Offer, which resulted in Sirius' premature termination of the Agreement; and 4) the Sirius Defendants engaged in activities to hinder the ability of W&P to manufacture and sell the C-1001 pursuant to its rights under the Agreement.

298.     The Sirius Defendants were and will continue to be directly unjustly enriched by the receipt of the Agreement Payments, the profits from the sale of products to W&P's customers due to the interference with W&P's ability to manufacture and sell its products and the defamation of W&P; the increased profits to be derived throughout the life of the patents due to the Sirius Defendants' premature termination of the Agreement; and profits that accrued to Sirius instead of W&P because W&P refrained from manufacturing its own eVDSD due to the false belief that the eVDSD product it was exclusively licensing was patented. Covelli and Simons were and will continue to be, personally enriched via their member distributions based upon Sirius's unjust enrichment; and it would be

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

unfair, inequitable, and/or unconscionable for the Sirius Defendants to benefit from the Agreement at the expense of, and detriment to W&P, which did not receive the bargained-for benefit of the exclusive license under the Agreement for the life of the patents.

299.    Equitable remedies that the Court may award W&P include, but are not limited to: 1) voiding the Agreement; 2) modifying the Agreement; 3) disgorging from the Sirius Defendants and paying to W&P the Agreement Payments and the increased profits obtained by the Sirius Defendants due to the breach of the Agreement, the interference with W&P's ability to manufacture and sell the C-1001, the early termination of the Agreement; 4) disgorging from the Sirius Defendants the profits of any sale or license of the Sirius IP to any third party in violation of Section 6 of the Agreement; and 5) the profits that accrued to Sirius instead of W&P because W&P refrained from manufacturing its own eVDSD due to the false belief that the eVDSD product it was exclusively licensing was patented; and 6) lost profits from the Sirius Defendants failure to renew the Agreement for the life of the patents.

## COUNT IX
## DECLARATORY JUDGMENT OF UNENFORCEABILITY OF THE PATENTS DUE TO INEQUITABLE CONDUCT
## (PLAINTIFF AGAINST COVELLI AND SIMONS)

300.    W&P repeats and re-alleges each of the foregoing and following allegations herein as though fully set forth herein.

301.    Every patent applicant, inventor, and person or entity associated with the filing or prosecution of a U.S. patent application before the USPTO ("Application Participants") has a statutory duty of disclosure and duty of candor and good faith in prosecuting said patent application pursuant to Federal Regulation 37 CFR §1.56.

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

302.     Application Participants are required to disclose to the USPTO any material, non-cumulative prior art reference that is known to the Application Participant and is relevant to the patentability of a claim of a pending patent application in which the Application Participant is participating.

303.     Failure to disclose a known, material, non-cumulative prior art reference that "compels a conclusion that a claim is unpatentable" (37 CFR §1.56(b)) may be interpreted as a knowing and intentional failure to disclose with the intent to deceive the USPTO where the evidence shows that individual associated with the application suspected that the reference might render a claim unpatentable, but chose to not disclose the reference nonetheless.

304.     As the Court of Appeals for the Federal Circuit stated in *Therasense, Inc. v. Becton, Dickinson and Company*, 649 F.3d 1276 (Fed. Cir. 2011) (*en banc*), "Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent," making the entire patent unenforceable against anyone. "Direct evidence of intent [to deceive] is not, however, required," the Federal Circuit's decision reads. "A court may infer intent from circumstantial evidence."

305.     Upon information and belief, Simons and Covelli, the co-inventors of the Patents under the Agreement, knew, and therefore Sirius knew, at least as early as December 18, 2015, of the '288 Patent assigned to Tektite, and its materiality to the patentability of the Sirius IP.

306.     Upon information and belief, Simons and Covelli believed, and therefore Sirius believed, at least as early as December 18, 2015, that the '288 Patent was relevant to or covered the model C-1001 Licensed Product, and Covelli informed, and therefore Sirius informed, Weems in writing on December 18, 2015 that the '288 Patent was relevant to, or covered the model C-1001 in agreeing that the C-1001 product should be marked or otherwise marketed in conjunction with the number of the '288 Patent.

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

307.    As of December 31, 2019, neither Covelli nor Simons disclosed the '288 Patent or any other Material Information to the USPTO during the prosecution of any of the Sirius IP having publicly available prosecution histories, and, upon information and belief, Covelli and Simons, with the intent to deceive, intentionally withheld and failed to disclose the '288 Patent to the USPTO during prosecution of the Sirius IP.   Covelli, Simons, and Sirius had knowledge of items (1) and (3) of the Material Information and, upon information and belief, had knowledge of item (2) of the Material Information.

308.    Upon information and belief, the Sirius Defendants intentionally falsely listed, and submitted false documents claiming Covelli and Simons as the inventors of the Sirius IP, and neither Covelli nor Simons invented the Sirius IP.

309.    Upon information and belief, the Sirius Defendants intentionally and knowingly omitted at least one true inventor of the Sirius IP with the intent of deceiving the USPTO.

310.    The '754 Patent was issued as a CIP of the '436 patent and a substantial amount of new subject matter was added to the application for the '754 Patent, which was filed on April 11, 2016, while Covelli participated as a member of the 132 Committee.  Upon information and belief, Covelli had access to USCG information obtained from discussions held during meetings of the 132 Committee and used this information to supplement the material in the application for the '754 Patent without disclosing same to the USPTO.

311.    Upon information and belief, Sirius and Covelli committed inequitable conduct and/or fraud on the USPTO in and during prosecution of at least one of the patent applications associated with the Patents, by: (1) knowing of multiple material, non-cumulative prior art references; (2) failing to disclose the references to the USPTO during prosecution of said patent application; (3) failing to disclose the true inventors of the Sirius IP to the USPTO; (4) submitting false statements indicating false inventorship to the USPTO, and (5) breaching the duty

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

of disclosure and the duty of candor and good faith during prosecution of said patent application by said failure to disclose involving a material misstatement or omission with intent to deceive.

312.     Upon information and belief, the Sirius Defendants intended to deceive the USPTO in hiding the Material Information because they knew that the Sirius IP would not be found patentable in light of the Material Information since the body of the device was known (it was disclosed in the '288 Patent), the On/Off Switch of the Sirius IP is identical to that disclosed in the '288 Patent, and the other specifications of the Sirius IP were dictated by the USCG.

313.     Upon information and belief, the Sirius Defendants intentionally withheld the Material Information for the purpose of increasing the likelihood of being granted a patent.

314.     Upon information and belief, the Sirius Defendants withheld the true inventorship of the Sirius IP because they did not want an Examiner to find the '288 Patent via an inventor search or a search of patents owned by Tektite.

315.     As a consequence of Sirius's aforementioned inequitable conduct and/or fraud on the USPTO, said patent application and any resulting patent issued therefrom are unenforceable.

316.     W&P requests a declaration that all patents issued from patent applications for which the Sirius Defendants intentionally failed to disclose Material Information and fraudulently misstated inventorship are unenforceable, and that W&P therefore cannot infringe any of such patents because such patents or patent applications are unenforceable.

## COUNT X

## FALSE PATENT MARKING

## (PLAINTIFF AGAINST COVELLI, SIMONS, TEKTITE, MELE)

317.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

318.    The false patent marking statute 35 U.S.C. §292(a) criminalizes false marking of products with patent information, including, "[w]hoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any word or number importing that the same is patented, for the purpose of deceiving the public; … Shall be fined not more than $500 for every such offense."  Subsection (b) provides, "A person who has suffered a competitive injury as a result of a violation of this section may file a civil action in a district court of the United States for recovery of damages adequate to compensate for the injury."

319.    At least as early as July 11, 2015, the C-1001 was being falsely advertised as a patented product including, without limitation, on the Web page located at www.siriussignal.com (the "Sirius Web Site"), which, at that time, depicted a picture of the C-1001 and the following language to the left side thereof "Designed, engineered, patented, and produced in the USA." The Sirius Web Site was under the control of Sirius and its members Covelli and Simons, and as such, they were all responsible for its content.

320.    Upon information and belief, the Tektite/Sirius Defendants were further responsible for this false marking as they caused to be manufactured, or assembled, floats that included "Patent #D720.247S" ("False Marking") thereon ("Falsely Marked Floats").  These Falsely Marked Floats are one of the components of the C-1001 and the False Marking is clearly visible on such floats. Covelli, Simons, and Sirius caused to be manufactured, assembled and packaged, and Tektite and Mele manufactured, assembled, and packaged the C-1001 incorporating the Falsely Marked Floats. C-1001s were then distributed and sold with the False Marking.

321.    The Tektite/Sirius Defendants undertook the above actions despite the fact that anyone could easily tell from viewing the '247 Patent that the design patented therein clearly did not resemble that of the C-1001, and therefore the '247

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

Patent clearly did not cover the model C-1001, and despite the fact they knew that all of the patents in the Sirius IP are invalid for at least the following reasons: obviousness, fraud, inequitable conduct, inventor misrepresentation, submission of fraudulent statements to the USPTO, and violation of the duty to disclose material art to the USPTO for reasons set forth elsewhere in this Complaint. This false advertising was done with the intent to deceive the public into believing that the C-1001 was patented in an effort to suppress competition, inflate prices, and further the Tektite/Sirius Defendants' conspiracy of licensing fraudulent patents to Weems/W&P for the purpose of disproportionate economic gain and increased distribution of the C-1001.

322.    The Sirius Defendants further falsely advertised to Weems, specifically Trogdon, that the '436 Patent covered the C-1001.  Upon information and belief, the '436 Patent was also affixed to the float of the C-1001 for a period of time.

323.    The Sirius Defendants also included the '436 Patent in Schedule B of the Agreement before it was executed, thereby advertising to Weems and Trogdon that the '436 Patent covered the C-1001 product.

324.    These false markings and false advertising were done with the intent to deceive the public, including Trogdon and Weems, into believing the C-1001 was patented to suppress competition, inflate prices, and further the Tektite/Sirius Defendants' conspiracy of licensing fraudulent patents to Weems for the purpose of disproportionate economic gain and increased distribution of the C-1001.

325.    Further, Covelli directed Mele verbally around December 30, 2015 to mark the C-1001 with the '436 Patent.

326.    The Tektite/Sirius Defendants caused at least "Patent #D720.247S" to be affixed to the C-1001, from at least as early as July 11, 2015 until approximately April 4, 2016, at which point Weems notified Mele and Tektite via email to remove the "current patent numbers," and Covelli was cc'd on this email.

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

This action was taken on advice of Belles, who notified Weems, Trogdon, and Covelli in writing via email on March 4, 2016 that the "issued patents do not cover the product" in reference to the '247 Patent, the '436 Patent, and the C-1001 ("Notification of False Marking Email).

327.    Despite receiving the Notification of False Marking Email, the Sirius Defendants continued to falsely advertise the C-1001 product to the public as patented. Evidence of this includes, without limitation, at least the Sirius Twitter posts of May 18, 2018, May 31, 2016, June 4, 2016, August 5, 2016, August 12, 2016, September 29, 2016, October 21, 2016, November 25, 2016, December 19, 2016 and February 2, 2017. These posts all depict the C-1001 in a position in which "Patent #D720.247S" of the Falsely Marked Floats is visible to a reader. A slight turn of the C-1001 would have obscured the False Marking.

328.    The February 2, 2017 Twitter post, which was posted nearly 11 months after Covelli received the Notification of False Marking, includes an enlarged view of the patent marking and was clearly meant to knowingly and intentionally deceive the public into believing the C-1001 was a patented product, despite at least Covelli's knowledge that the '247 Patent did not cover the C-1001. Upon information and belief, this picture did not even depict the C-1001 as it was sold at the time of the Twitter post.

329.    Furthermore, as late as July 1, 2019, the Sirius Web Site still depicted the C-1001 with the words "Patent Numbers: 9,171,436 and D720,247" and despite at least Covelli's receipt of the Notification of False Marking Email.

330.    This false marking continues to present day as the Sirius Web Site, as of March 30, 2020, continues to list the C-1001 as being covered by the '754 Patent, the '114 Patent, the '175 Patent, the '920 Patent, and the '477 Patent, and the patents page of the Sirius Web Site specifically states that "this page is intended to serve as notice under 35 U.S.C. § 287(a)." This advertising also constitutes false marking as the Sirius Defendants know that all of the patents in

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

the Sirius IP are invalid for at least the following reasons: obviousness, fraud, inequitable conduct, inventor misrepresentation, submission of fraudulent statements to the USPTO, and violation of the duty to disclose material art to the USPTO for reasons set forth elsewhere in this Complaint.  This marking is performed with the intent to deceive the public into believing the C-1001 is patented.

331.     In at least the ways mentioned above and otherwise herein in this Complaint, the Sirius Defendants deceived the public in general, and Weems and W&P in particular, that model C-1001 was a patented product covered by the '247 Patent, the '436 Patent, and the other Sirius IP in violation of 35 U.S.C. §292(a).

332.     Weems and W&P suffered numerous competitive injuries due to the false marking of the Sirius Defendants.

333.     Prior to execution of the Agreement, Weems and Sirius were competitors for at least the reason that they both sold marine products directly to consumers.  The false marking actions, and other actions of the Sirius Defendants that were performed to advertise the C-1001 and other Sirius products as patented, caused Weems to enter licensing negotiations with Sirius, and subsequently fraudulently induced Weems to license purported exclusive rights from Sirius, because it believed that the C-1001 product was patented and a license was required to distribute it.

334.     These same false marking actions caused W&P to purchase the Agreement as it believed that the C-1001 product was patented and a license was required to distribute it.  As such, Weems and W&P incurred significant damages in the form of, at least,  excessive Agreement Payments for an exclusive license to license a product that was not in fact covered by valid patents and lost profits due to not manufacturing its own eVDSD due to the false belief that a license was required to manufacture and sell the eVDSD.

/ /

335.     W&P further suffered a competitive injury due to the false marking because it lost sales of the C-1001 to at least Customer A because Customer A believed the product was patented, there was a dispute about the right to manufacture the C-1001 product, and Customer A decided to wait to purchase the product from W&P until the issue was resolved.

## COUNT XI

## SHERMAN ACT, 15 U.S.C. § 1:

## CONSPIRACY IN RESTRAINT OF TRADE

## (PLAINTIFF AGAINST ALL DEFENDANTS)

336.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

## INTERSTATE TRADE AND COMMERCE

337.     Throughout the Injury Period, there was and continues to be a continuous and uninterrupted flow of interstate trade and commerce throughout the United States and worldwide in the sale of eVDSDs by Defendants and their co-conspirators to their customers located throughout the United States and worldwide.

338.     Throughout the Injury Period, Defendants' and their co-conspirators' unlawful conspiracy and agreement took place within, and substantially affected the flow of, interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce throughout the United States and worldwide.

## RELEVANT MARKET

339.     The relevant product market alleged herein is the market for eVDSDs. The relevant geographic market is worldwide.

340.     Pyrotechnic flares are not a part of the relevant market because buyers will not purchase flares in lieu of eVDSDs due to a price increase in eVDSDs. Most eVDSD buyers purchase eVDSDs as an alternative to flares because eVDSDs do not have an expiration date, but flares need to be replaced when they

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

are 42 months old in order to comply with USCG Distress Signal Regulations. Further, many purchasers avoid buying flares because they believe they are toxic for the environment.

341.    As Plaintiff was an exclusive worldwide distributor and is a Maryland entity and the C-1001 is marketed as a Made in America product, the inability to manufacture the products in the United States due to the attempted enforcement of fraudulent patents has an effect worldwide on the price of eVDSDs.

## FACTS

342.    A violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 requires: (1) there was a contract, combination or conspiracy, (2) the agreement unreasonably restrained trade, and (3) the restraint affected interstate commerce.

343.    Defendants engaged in an unlawful conspiracy, as outlined herein, by agreeing to fix, stabilize, inflate, and maintain the price of, eVDSDs licensed and sold to companies and customers in the United States and worldwide, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

344.    Defendants agreed to engage in all activities necessary to provide the Sirius Defendants with a monopoly in the eVDSD market including the elimination of W&P as a competitor and the other Conspiracy Acts, and in furtherance of this goal, the Sirius Defendants would profit from the monopoly and associated sales of the eVDSDs, and the remaining Defendants would profit financially through the provision of goods and services related to manufacturing of the eVDSDs to the Sirius Defendants in accordance with the monopoly.

345.    The conspiracy alleged herein is a per se violation of Section 1 of the Sherman Act. 381. At a minimum, Defendants engaged in vertical price fixing via implementation of an illegal MAP. Alternatively, the conspiracy alleged herein is a rule of reason violation of Section 1 of the Sherman Act. 382. There was no procompetitive business justification for Defendants' unlawful conspiracy. Even if

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

there were some ostensible procompetitive justification, the Defendants' conduct was not the least restrictive alternative method to achieve such a purpose.

346.    Defendants illegally conspired to raise the price of eVDSDs by using the Sirius MAP Policy as defined below.  Sirius maintains a written MAP policy (the "Sirius MAP Policy").  The purpose of the Sirius MAP Policy as stated therein is to "allow our resellers to maintain high profit margins."

347.    As also stated in the Sirius MAP Policy, "[a]ll Sirius Signal Authorized Resellers must agree to the terms and conditions of the following MAP Policy" and "[a]ny and all dealers selling Sirius Signal products which have not signed a Sirius Signal MAP Policy agreement are classified as "Unauthorized Resellers" and "Unauthorized Resellers should not be sold to or provided a feed from any distributor whatsoever."

348.    Upon information and belief, Sirius requires every entity selling a Sirius product to execute its Sirius MAP Policy, and although the policy indicates that "Resellers are free to set the actual resale price of any product," it is understood that resellers were not to set the product to different prices without the approval of Sirius.

349.    If prices were to be set to a lower level, it had to be done with the express, advance approval of Sirius as stated in the Sirius MAP Policy, i.e., "From time to time, Sirius Signal may permit resellers to advertise MAP Products at prices lower than the MAP price. In such events, Sirius Signal reserves the right to modify or suspend the MAP price with respect to the affected products for a specified period of time by providing advance notice to all resellers of such changes."

350.    Upon information and belief, the Sirius MAP Policy was also designed to impede the sales of its goods over the Internet at a price less than the MAP price.

/ /

Victor Rane
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

351.    Defendants engaged in a horizontal boycott in agreeing to not sell goods and services to W&P in order to prevent W&P from competing in the eVDSD marketplace, which resulted in the inability of W&P to manufacture the C-1001, even during a time period in which the Defendants do not dispute that the Agreement was in effect.  The inability of W&P to compete with Sirius due to lack of inventory resulted in increased eVDSD pricing to resellers and, potentially the end consumer, due to lack of competition.

352.    Defendants and their co-conspirators furthered and effectuated their conspiracy, and restrained trade of eVDSDs by, inter alia, performance of the Conspiracy Acts as set forth above.   The facts supporting these allegations are set forth throughout this Complaint including, but not limited to, in the Introduction and Facts sections.

353.    The agreement of the Defendants to commit the Conspiracy unreasonably restrained trade by, at a minimum, artificially inflating prices to meet the MAP pricing levels, and preventing competition via assertion, licensing, and enforcement of fraudulent patents, and this restraint has affected interstate commerce by removing competition (there are only two sellers of eVDSDs and they are in license negotiations with each other) and maintaining the price of eVDSDs at the artificially high level of $89.95.

354.    The restraint of trade of eVDSDs affected interstate commerce by falsely inflating the price of eVDSDs in the relevant market through the elimination and suppression of competition.

355.    The anticompetitive effect of the Conspiracy is to maintain competitors in the eVDSD market to one or two, depending on the timing.  First, in 2015, the only competitor was Sirius as it claimed that its device was patented and it was the only eVDSD approved by the USCG. Thereafter, after execution of the Agreement on December 31, 2015, the sole competitor was Weems/W&P under

/ /

Victor Rane
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

license to Sirius until approximately April 2018, at which point Orion entered the relevant market.

356.     Upon Orion's entry into the market, the Defendants conspired to drop the current exclusive licensee, W&P, in favor of offering a license to the sole competitor they could not get rid of otherwise.  In this manner, the Defendants conspired to maintain a monopoly in the eVDSD.

357.     The market share of Sirius prior to Orion entering the market was 100%.  Upon information and belief, after entry of Orion, and without placing Orion under a license agreement, Orion has continually worn away at Sirius' market share such that the share is approximately 50%.

358.     Once the Tektite/Sirius Defendants decided to terminate W&P and compete against W&P, the Defendants acted in concert to limit the supply of the C-1001 by ceasing supply of same and the components thereof to W&P in an attempt to eliminate competition from W&P such that Sirius could maintain prices for the eVDSDs at a fixed price point.

359.     The sole competitor Orion conspicuously lists its Orion Kit at the same price as the Sirius Map Policy price, namely, $89.95 despite the fact that the cost of manufacturing an eVDSD kit is approximately twenty dollars.

360.     The Defendants have attempted to and have conspired to monopolize and, deliberately and by conscious parallelism, have monopolized trade and commerce in the eVDSD industry by Conspiracy Acts enumerated herein in violation of the anti-trust laws, including Sections 1 and 2 of the Sherman Act.

**A. The eVDSD Market in the United States is Susceptible to Collusion**

361.     Publicly available data on the eVDSD market in the United States demonstrates that it is susceptible to cartelization by the Defendants and their co-conspirators. Factors that make the eVDSD market susceptible to collusion during the Conspiracy Period include: (1) a standardized product for which competition was principally on the basis of price; (2) stable or declining input costs for much of

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

the Conspiracy Period; (3) the lack of available economic substitutes; (4) high

barriers to entry; and (5) industry concentration.

**(1)   eVDSDs are a standardized product for which competition is principally on the basis of price**

362.     eVDSDs are standardized products for which competition is

principally based upon price.

363.     To date, the only available economic substitute available to the Sirius

C-1001 Kit is the Orion Kit.  Defendants have attempted to place Orion under

Defendants' control via a licensing agreement.

364.     A comparison of the C-1001 Kit and the Orion Kit shows that the

products are essentially the same and include a handle, a float, a lens, and a light

shining through the lens when such light is activated.

365.     Further, these two eVDSD models must both comply with the USCG

Regulations which dictate many aspects of the product including, without

limitation, light brightness, light color, signaling manner, independent power

source, float ability in fresh water, waterproof switches, and that the electric light

may not be equipped with a switch mechanism which permits continuous display

of a beam of light except that the light may be equipped with a switch which

returns to the off position when pressure is released. As such, due to the similarity

of eVDSDs, competition between eVDSD is principally based upon price.

**(2)   Stable or Declining Input Costs**

366.     The cost of producing an eVDSD has very slightly declined over the

years.  For example, the cost of manufacturing the C-1001 bodies with lens and

assembling the C-1001 in a clamshell package with a card insert has slightly

declined over the years that it has been sold, and the costs of the other components

(e.g., the flag) have remained constant, yet the sales price has remained constant at

$89.95 - $99.99 per unit.  For example, in 2016, the cost of manufacturing the C-

1001 excluding the cost of the float, flag, circuit board and packaging was $10.03,

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

which dipped to $9.13 in 2017, and then settled out at $9.67 in 2019.  The total cost to manufacturer the C-1001 as a whole has remained relatively stable at approximately $19.53 throughout the Conspiracy Period.

**(3)     Lack of Available Economic Substitutes**

367.     Economists regard products as economic substitutes for one another if a nominal change in price for one product results in increased demand for the other product. The change in price necessary to cause consumers to switch to a substitute good is often considered to be around five percent.

368.     There is no economic substitute for eVDSDs, and the lack of available economic substitutes for a product facilitates collusion among producers, because customers are not reasonably able to avoid supra-competitive prices by switching to another product.

**(4)     There Are Significant Barriers to Entry in the eVDSD Market**

369.     Supra-competitive pricing in a market typically attracts additional competitors attempting to avail themselves of the inflated prices. Significant barriers to entry, however, make new competition more difficult and facilitate the formation and maintenance of a cartel.

370.     There are significant barriers to entry which have prevented potential competitors from effectively competing in the eVDSD market in the United States during the Injury Period. A first barrier to entry is the assertion of fraudulently procured patents by Defendants against potential competitors and the deterring of potential competitors due to the knowing false marking of its C Series Products with "patent pending," or patent numbers that are either expired, did not cover the product, or are unenforceable due to inequitable conduct before the USPTO.

371.      Further barriers include satisfaction of regulatory requirements, i.e., obtaining USCG approval under regulations that, upon information in belief, constantly changed in part due to the influence of Covelli's presence on the USCG committee.  Access to distribution channels was also limited as Defendants sought

Victor Rane
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

to lock up all marine distribution channels through the Agreement and its MAP policies.  The eVDSD market had one new entrant during the Conspiracy Period, namely, Orion.

372.    Defendants are further suppressing competition by attempting to influence the USCG Distress Signal Regulations such that they would exclude single color eVDSDs, which would leave the improved C-1002 Sirius eVDSD as the only USCG-approved eVDSD, thereby resulting in a monopoly.

### (5)    The eVDSD Industry Is Highly Concentrated

373.    The eVDSD industry is dominated by a small number of companies. Prior to its attempted termination of the Agreement, eVDSDs were sold by two companies, namely, W&P and Orion.  After attempting to wrongfully terminate the Agreement and license the Sirius IP to Orion, if successful, only Orion would remain.  If unsuccessful, two competitors will remain, Sirius and Orion.

374.    The concentration in the eVDSD industry is further exacerbated by agreements among Defendants and their co-conspirators to distribute one another's products.  For example, Tektite distributes at least the C-1001 on its website, and Sirius distributes Tektite's products on the Sirius Web Site.  Such swaps, trades, and selling and distribution agreements among competitors in a consolidated market facilitate collusion among ostensible competitors.

### B. Opportunities To Collude Facilitated The Conspiracy

375.    There were countless opportunities for Defendants to communicate and conspire with each other. Upon information and belief, Defendants regularly met and/or discussed each other's business.  Defendants hid the nature of their relationship, and their conspiracy, from others.

376.    Defendants secretly targeted a business relationship with their only competitor Orion at some point prior to termination of the Agreement in breach of the Right of First Offer to their exclusive worldwide distributor W&P.

/ /

377.     Upon information and belief, throughout the Conspiracy Period, at least the Tektite/Sirius Defendants were in regular communication to facilitate the conspiracy.

378.     Defendants and their co-conspirators enjoyed supra-competitive profit margins on the sale of eVDSDs, or the cost of producing the eVDSDs or components thereof, and inflated royalties during the Conspiracy Period due to the false belief that Defendants owned valid patents that protected the eVDSDs. Thus, potential sellers of eVDSDs could have entered the market and sold eVDSDs at considerably lower prices and still make a profit, however, these potential sellers were deterred by the anti-competitive conduct of the Defendants. Among the reasons for Defendants and their co-conspirators to hide their conspiracy and the invalidity of the Sirius Patents was to protect their supra-competitive profit margins.

**C. Policing and Enforcement Efforts**

379.     Upon information and belief, Defendants also undertook specific efforts to monitor and enforce the conspiracy.

**D. Defendants and Their Co-Conspirators Maintained, and Continue to Cause Injury Through and Benefit from, Their Unlawful Conspiracy**

380.     Defendants, each having joined and participated in the unlawful conspiracy described herein, and each having performed overt acts in furtherance of this unlawful conspiracy, needed to affirmatively withdraw from the unlawful conspiracy in order to terminate their participation therein.

381.     None of the Defendants and their co-conspirators did so. To the contrary, upon information and belief, the Defendants continue to communicate with each other about the subject matter of the conspiracy, continue to conceal the conspiracy from customers and the general public, and continue to substantially maintain (and, in some cases, even increase) the supra-competitive prices they charged for eVDSDs.

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

382.     Concealing the conspiracy from their licensees, customers and the general public enabled Defendants and their co-conspirators to maintain, and continue to cause injury through and benefit from, their unlawful conspiracy concerning eVDSD as evidenced, inter alia, by their ability to substantially maintain, or even increase, the supra-competitive prices they charged their customers for eVDSD.

383.     Defendants' eVDSD pricing behavior cannot be justified by higher component or manufacturing costs, as the prices for the components used to manufacture eVDSDs and the cost of manufacturing the eVDSDs has slightly decreased during the Conspiracy Period.

384.     As a result of the conspiracy among Defendants and their co-conspirators, Plaintiff has been forced to pay supra-competitive royalties for eVDSD under the false belief that they were protected by patents.

385.     As a result of Defendants' unlawful conspiracy, Plaintiff sustained damages to their business or property. The full amount of such damages will be determined after discovery and upon proof at trial and, include, at a minimum future lost profits from failure of the Sirius Defendants to offer W&P the Right of First Offer for the license of the C-1002.

386.     The conspiracy had its intended effect, and the Sirius Defendants benefitted by reaping inflated royalties, revenues, and profits from their supra-competitive eVDSD pricing in the form of Amazon sales and sales to resellers, and Emlinq and the Tektite Defendants benefitted from inflated profits from sales of the components of, or manufacturing of, the eVDSD to the Sirius Defendants.

387.     Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Antitrust Act.

388.     Plaintiff reserve the right to add additional Defendants as information is developed as to other parties.

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

### E. Fraudulent Concealment

389.     Defendants and their co-conspirators engaged in a successful unlawful conspiracy which, by its very nature, was self-concealing.

390.     Upon information and belief, Defendants and their co-conspirators used non-public means of communication, such as electronic email communications and verbal communications to conceal their agreements to eliminate competition by committing the Conspiracy through performance of the Conspiracy Acts.  Upon information and belief, Defendants and their co-conspirators wrongfully concealed and carried out their illegal conduct in a manner that was designed to, and did, preclude detection.

391.     Plaintiff did not have actual or constructive knowledge of Defendants' and their co-conspirators' unlawful scheme until on or about November 1, 2019, when its counsel investigated the facts of the claims in preparing a first amended complaint in the pending litigation having Case No. 1:19-cv-02330-RDB (Hon. Richard D. Bennett).  Because Defendants' and their co-conspirators' anticompetitive conduct was both self-concealing and affirmatively concealed by Defendants and their co-conspirators', neither Plaintiff nor any other eVDSD purchasers learned, or could have learned or discovered, the operative facts giving rise to this Complaint until sometime after November 1, 2019.  No information, actual or constructive, was ever made available to Plaintiff or any other eVDSD purchasers that would have led a reasonably diligent person to investigate whether an unlawful conspiracy with regard to eVDSD existed prior to November 1, 2019.

392.     W&P's discovery of the '288 Patent alone and the Sirius Defendants' failure to disclose the '288 Patent to the USPTO during prosecution of the Sirius Patents was not sufficient to put Plaintiff or any other reasonable United States purchaser of eVDSD on notice that an extensive conspiracy to suppress competition and fix the price of eVDSDs may have existed. Not only did Defendants and their co-conspirators conduct their conspiracy in secret, they also

1    affirmatively misled their customers, including Plaintiff, as to the existence of their

2    unlawful conspiracy.

3        393.      In selling the eVDSDs, Defendants and their co-conspirators often

4    falsely asserted that their eVDSDs were patent protected and that in the near

5    future, would be the only eVDSDs licensed by the USCG thereby providing an

6    excuse concealing the true cause of the inflated price of the eVDSDs – the

7    unlawful conspiracy – from eVDSD purchasers.

8        394.      The affirmative misrepresentations Defendants and their co-

9    conspirators made to Plaintiff and other eVDSD purchasers, were meant to, and

10   did, prevent Plaintiff from discovering the actual reason for the artificially-inflated

11   prices and royalties. Because of the self-concealing nature of Defendants' and their

12   co-conspirators' unlawful conspiracy and the affirmative acts of concealment

13   described above, Plaintiff were unaware of Defendants' and their co-conspirators'

14   unlawful conspiracy and were unaware that they were paying artificially inflated

15   royalties for eVDSDs during the Injury Period. The self-concealing nature of

16   Defendants' and their co-conspirators' conspiracy, coupled with the affirmative

17   acts of concealment described herein, prevented Plaintiff from discovering through

18   reasonable diligence that Defendants and their co-conspirators had engaged in the

19   unlawful conspiracy described herein. Accordingly, Defendants' their co-

20   conspirators' fraudulent concealment tolled all statutes of limitations applicable to

21   Plaintiff's claims. No applicable statute of limitations began to run on Plaintiff's

22   claims until, at the earliest, November 1, 2019, the day upon which Plaintiff's

23   counsel uncovered facts suggesting the need to further investigate the claims set

24   forth herein.

25   / /

26   / /

27   / /

28   / /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

# COUNT XII

## SHERMAN ACT, 15 U.S.C. § 1, 2: CLAYTON ACT, 15 U.S.C. § 3 TYING
## (PLAINTIFF AGAINST THE SIRIUS DEFENDANTS)

395.    Plaintiff incorporate by reference the preceding and following paragraphs as though set forth fully herein.

396.    Impermissible tying arrangements arise when a party agrees to sell one product (the tying product, i.e., the C-1001/C-1003) but only on the condition that the buyer also purchases a different (or tied) product, i.e., the C-1002. To establish a per se tying claim under §§ 1 and 2 of the federal Sherman Antitrust Act,  a Plaintiff must prove (1) the existence of two separate products, i.e., in this case, the C-1001/C-1003 (one color light) and the C-1002 (two color light); (2) an agreement conditioning purchase of the tying product upon purchase of the tied product (or at least upon an agreement not to purchase the tied product from another party); (3) the seller's possession of sufficient economic power in the tying product market to restrain competition in the tied product market; and (4) a not insubstantial impact on interstate commerce.

397.    The conspiracy alleged herein is a per se violation of Sections 1 and 2 of the Sherman Act.

398.    During negotiation of a fourth amendment to the Agreement (the "Fourth Amendment"), the Sirius Defendants conditioned the signing of the Fourth Amendment and the licensing of the C-1001/C-1003 upon the execution of a new license for the C-1002 including payment of a substantial upfront fee of two hundred and seventy thousand dollars ($275,000).

399.    The Sirius Defendants possessed sufficient economic power in the tying product market to restrain competition in the tied product market.  Upon information and belief, at the time of the attempted tying agreement, the Sirius Defendants had at least fifty percent market share of the eVDSD market.  Further, the Sirius Defendants claimed that its eVDSD and the Orion eVDSD were covered

by the Sirius IP, and as such, implied to other potential suppliers of eVDSDs and W&P that it would likely achieve a monopoly in the eVDSD market through enforcement, or licensing, of the Sirius IP against Orion.

400.     As described herein, the Sirius Defendants demonstrated market power by reducing output of eVDSD products by controlling the information required to manufacture the eVDSD and by conspiring with manufacturers to deny and delay orders and to artificially increase the costs of manufacturing eVDSDs for W&P.

401.     The requisite market power for a tying agreement may be inferred when the tying product (i.e., the C-1001 or C-1003) is patented, which Sirius claims it is, because a buyer is unable to buy the product elsewhere.  If Orion takes a license under the Sirius IP, there would be no alternative, USCG-approved eVDSD product available for a purchaser to buy elsewhere.

402.     The Sirius Defendants wished to use its market power in the eVDSD market to force W&P to do something it would not otherwise do, i.e., pay $275,000 for an upfront licensing fee for the C-1002 (in addition to ongoing royalties) despite the fact that W&P had already licensed the C-1002 under the Agreement.  The Sirius Defendants coerced W&P to license the C-1002 in order to license the product it definitely wanted, namely the C-1001/C-1003.

403.     The C-1001/C-1003 and C-1002 have separate demand functions such that customers would never buy them together. A customer buying either the C-1001/C-1003 or the C-1002 will have no need for the other product because the products perform the same function, (i.e., night distress signal), and only one of such lights is required to be carried aboard a boat in order to comply with USCG regulations.  However, the C-1002 is at a price point triple of the C-1001/C-1003 and arguably has better recognition than the C-1001/C-1003 for first aid responders or the like.

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

404.    The impact on interstate commerce of the proposed tying agreement would not have been insubstantial.  No other two color eVDSD exists in the market so a successful tying arrangement would have affected 100% of the two color eVDSD market.  Additionally, the only other eVDSDs available for sale at the time of the proposed tying agreement and today are the single color Sirius C-1001/C-1003 eVDSD and the single color Orion eVDSD.  At the time of the proposed tying agreement, upon information and belief, Sirius intended to license its Sirius IP to Orion to cover the Orion eVDSD, thereby monopolizing the eVDSD market. The tying of the C-1002 to the C-1001/C-1003 would have allowed Sirius to retain a monopoly on the entire eVDSD marketplace by allowing only W&P and Orion to distribute eVDSDs rather than allowing a third company to independently license the C-1002.

405.    Also, the tying of the eVDSD to the C-1001/C-1003 will have the impact of raising the price of these products as the licensee would need to raise prices in order to be compensated for the $275,000 upfront licensing fee for the C-1002.

406.    Alternatively, the conspiracy alleged herein is a rule of reason violation of Section 1 of the Sherman Act. 382. There was no procompetitive business justification for Defendants' unlawful conspiracy. Even if there were some ostensible procompetitive justification, the Defendants' conduct was not the least restrictive alternative method to achieve such a purpose.

## COUNT XIII

## SHERMAN ACT, 15 U.S.C. § 2:

## MONOPOLIZATION

## (PLAINTIFF AGAINST ALL DEFENDANTS)

407.    W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

408.    The facts as set forth herein in the Complaint indicate that the Defendants had:  (1) a specific intent to monopolize the eVDSD market; (2) predatory or anticompetitive acts in furtherance of the intent including, but not limited to the Conspiracy Acts; and (3) a dangerous probability of success in that the Defendants, *inter alia*, have blocked the exclusive distributor W&P from manufacturing and selling the product to decrease supply of eVDSDs, the Defendants are attempting to license the Sirius IP to the sole eVDSD competitor, Orion, and simultaneously the Defendants are conspiring to change the USCG Distress Signal Regulations such that only its new two color light (the C-1002) will be USCG-approved, in which case the Defendants will again achieve a full monopoly and will achieve the supra-competitive price of $299.99 for all USCG-approved eVDSDs.

409.    The predatory and anticompetitive acts are, at a minimum, the Conspiracy Acts and other acts set forth above and included elsewhere in this Complaint.

410.    Defendants have a dangerous probability of success as they have shut out the exclusive licensee of the eVDSDs, W&P, via a false breach of contract claim and a horizontal boycott of W&P's supply of the C-1001 eVDSD, and components thereof, in order to license the only other competitor in the eVDSD market, Orion, and are currently in negotiations with Orion.  If these negotiations are successful, there will be a true monopoly in the eVDSD market, i.e., Sirius will control 100% of the eVDSD market through its sole licensee, Orion.  Even if these negotiations are not successful, Sirius has still gained at least a 50% share in the eVDSD market via wrongfully terminating its exclusive licensee, W&P.

411.    The Sirius Defendants have willfully acquired and maintained monopoly power in the relevant market through the Conspiracy Acts including, without limitation the ongoing procurement, licensing, and assertion of fraudulent U.S. Patents, the control of information and manufacturers necessary to

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone:  (310) 388-4849

1  manufacture eVDSDs, and manipulation of the USCG regulations vis a vis

2  Covelli's position as a member of the 132 Committee.

3      412.    The Sirius Defendants have the power to control eVDSD prices and

4  do control prices through the implementation of the Sirius MAP Policy.  Sirius is

5  attempting to exclude competition and obtain a monopoly by forcing the sole

6  competitor, Orion, to license its fraudulent patents and comply with the Sirius

7  MAP Policy.

8      413.    Upon information and belief, Sirius has a market share of 50% or

9  higher and, if successful in licensing negotiations with Orion, it will own 100% of

10  the market share.

**COUNT XIV**

**CALIFORNIA CARTWRIGHT ACT (ANTITRUST)**

**Business and Professions Code 3 § § 16700-16758**

**RESTRAINT OF TRADE**

**(PLAINTIFF AGAINST ALL DEFENDANTS)**

16      414.    W&P repeats and re-alleges each of the foregoing and following

17  allegations as though fully set forth herein.

18      415.    The Defendants by agreement and conspiracy with each other

19  unreasonably restrained trade or commerce via perpetrating the Conspiracy Acts

20  and other acts set forth herein.

21      416.    Defendants engaged in an unlawful conspiracy by agreeing to fix,

22  stabilize, inflate, and maintain the price of eVDSDs sold to companies,

23  municipalities, and governmental subdivisions in, among other places, the State of

24  California, in violation of the California Antitrust laws and the Cartwright Act.

25      417.    Plaintiff is a Maryland limited liability company and has standing to

26  maintain an action to recover damages sustained as a result of a violation of the

27  California Antitrust laws and the Cartwright Act regardless of whether Plaintiff

28  purchased directly or indirectly with a person who committed the violation.

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

418.     The conspiracy alleged herein is a per se violation of the California Antitrust laws and the Cartwright Act. Alternatively, the conspiracy alleged herein is a rule of reason violation of the Cartwright Act.

419.     There was no procompetitive business justification for Defendants' unlawful conspiracy. Even if there were some ostensible procompetitive justification, the Defendants' conduct was not the least restrictive alternative method to achieve such a purpose.

420.     Defendants and their co-conspirators furthered and effectuated their conspiracy, inter alia, by committing the Conspiracy Acts and other acts alleged herein.

421.     As the result of Defendants' unlawful conspiracy, Plaintiff sustained damage to its business or property. The full amount of such damages will be determined after discovery and upon proof at trial.

422.     The conspiracy had its intended effect, and Defendants benefitted by reaping inflated revenues from their supra-competitive eVDSD pricing.

423.     Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under the California Antitrust laws and the Cartwright Act.

424.     Plaintiff reserves the right to add additional Defendants as information is developed as to other parties.

**COUNT XV**

**CALIFORNIA CARTWRIGHT ACT (ANTITRUST)**

**Business and Professions Code 3 § § 16700-16758**

**ATTEMPT AND CONSPIRACY TO MONOPOLIZE**

**(PLAINTIFF AGAINST ALL DEFENDANTS)**

425.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

426.     The Defendants monopolized, attempted to monopolize, and combined and conspired with each other to monopolize the eVDSD trade or commerce worldwide for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce.

427.     Defendants engaged in an unlawful conspiracy by agreeing to fix, stabilize, inflate, and maintain the price of eVDSDs sold to companies, municipalities, and governmental subdivisions in, among other places, the State of California, in violation of the California Cartwright Act.

428.     Plaintiff is a Maryland limited liability company and has standing to maintain an action to recover damages sustained as a result of a violation of the California Cartwright Act regardless of whether Plaintiff purchased directly or indirectly with a person who committed the violation.

429.     The conspiracy alleged herein is a per se violation of the California Cartwright Act.  Alternatively, the conspiracy alleged herein is a rule of reason violation of California Cartwright Act.

430.     There was no procompetitive business justification for Defendants' unlawful conspiracy. Even if there were some ostensible procompetitive justification, the Defendants' conduct was not the least restrictive alternative method to achieve such a purpose.

431.     Defendants and their co-conspirators furthered and effectuated their conspiracy, inter alia, by committing the Conspiracy Acts and other acts alleged herein.

432.     As the result of Defendants' unlawful conspiracy, Plaintiff sustained damage to its business or property. The full amount of such damages will be determined after discovery and upon proof at trial.

433.     The conspiracy had its intended effect, and Defendants benefitted by reaping inflated revenues from their supra-competitive eVDSD pricing.

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

434.     Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under the California Cartwright Act.

435.     Plaintiff reserves the right to add additional Defendants as information is developed as to other parties.

**COUNT XVI**

**BUSINESS DEFAMATION**

**(PLAINTIFF AGAINST THE SIRIUS DEFENDANTS)**

436.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

437.     Upon information and belief, Covelli and Sirius committed defamation by: (1) making  defamatory statements regarding W&P to the Finnish Safety and Chemicals Agency; (2) the statements were false; (3) Sirius was legally at fault in making the statement and (4) W&P suffered harm thereby.

438.     On or about August through October 2019, Covelli had an email exchange with Jenni Mutka of the Finnish Safety and Chemicals Agency in which he made false statements to the detriment of W&P.

439.     On or about August 9, 2019, Covelli told the Finnish Safety and Chemicals Agency that their licensee W&P sent the product at issue with a red lens to a supplier in Finland.  The email continued "The items were supplied and sent by Weems & Plath (Annapolis MA) and, incorrectly identified by the same model number as the US government required version.  This incorrect labeling on the unit can lead to confusion as to which light is legal for the US should the lights sold in Finland make there [sic] way outside of Finland.  They could cause more serious issues should the lights be deployed by boaters and ships crew as the color and flash characteristics (SOS) of a red light mean nothing in other countries, particularly in the US.  Our company as holders of the IP have great liability because these two lights carry the same C-1001 model #.  See attached photo's

Additional these light were received with no packaging as per Finnish requirements."

440.    Sirius knew or should have known that the following statement identified in at least paragraph 492 is false: "Our company as holders of the IP have great liability because there two lights carry the same C-1001 model #." Sirius knew that the license agreement provided them indemnification, and they were not subject to great liability, and Sirius had previously approved shipment of the red lights to Finland in the same form in which they were sent.

441.    Sirius intended to deceive the Finnish Safety and Chemicals Agency by this statement so that the agency would pull the product from the market in Finland and would contact W&P's client Multimarine, thereby damaging W&P's relationship with Multimarine and its ability to sell product to Multimarine at a future date.

442.    On or about September 8, 2019, Covelli emailed Jenni Mutka at the Finnish Safety and Chemicals Agency and stated in part: "The company in Finland is Multimarine … This incorrectly marked and labeled life-saving device (selling in Finland right now) must be corrected … Same Unit labeled C-1001 with RED FLASHING SOS and identical US bar code (as the [sic] WHITE version), sold in Finland.  This is a not acceptable, as only the WHITE SOS VERSION MODEL C-1001 is authorized for carriage … It is imperative this be enforced by the Finnish authorities as the confusion can lead to boaters believing that the light Model C-1001 in RED can lead to recognition and rescue.  Model C-1001 markings can only be on the WHITE SOS.  This type of confusion can lead to a grave situation with a unfortunate outcome.  Each incorrectly labeled unit sold increases the chance of tragedy.  Risk in this case, can be mitigated with swift enforcement.  Please confirm you are taking action for the safety of boaters in the United Sates [sic] as well as the EU.  I will forward a copy of your corrective action to the proper US Governmental agencies."

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

443.     Sirius knew or should have known that at least the following statement identified in paragraph 495 above is false: "and identical US bar code (as the [sic] WHITE version)" as Sirius was notified in writing on August 1, 2019 that the Finnish Light carried a "different UPC code from the lights sold in the U.S."

444.     Sirius intended to deceive the Finnish Safety and Chemicals Agency by this statement so that the agency would pull the product from the market in Finland and would contact W&P's client Multimarine, thereby damaging W&P's relationship with Multimarine and its ability to sell product to Multimarine at a future date.

445.     As a result of the statements identified in paragraph 495 above, the Finnish Safety and Chemicals Agency contacted the Finnish importer of the product and requested additional information and pictures regarding the product.

446.     The statements identified in paragraph 495 above caused harm to W&P's business reputation, as they placed W&P's customer, Multimarine, in the position of having a conflict with a governmental agency, specifically, the Finnish Safety and Chemicals Agency and are thus defamation per se.

447.     Additionally, the statements identified in paragraph 495 above directly caused W&P damage in loss of future sales to the Finnish importer.

## COUNT XVII
## LANHAM ACT
## FALSE ADVERTISING
## (PLAINTIFF AGAINST THE TEKTITE AND SIRIUS DEFENDANTS)

448.     W&P repeats and re-alleges each of the foregoing and following allegations as though fully set forth herein.

449.     To establish a Lanham Act false advertising claim, a Plaintiff must prove that:  (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the

purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

450.    On August 25, 2019, during the time that the Agreement was still in effect, the Tektite/Sirius Defendants made the false or misleading description of fact or representation of fact in a commercial advertisement, namely, *inter alia*, in at least a press release on the Sirius Web Site, that (1) "as a part of this roll out, Sirius Signal will no longer license its technology, and will be the sole manager of all distribution and retailer partnerships" and (2) "[w]ith the expiration of Sirius Signal's patent license agreement with Weems & Plath, Sirius Signal will be the sole manufacturer of its patented SOS Distress Light."

451.    Statement (1) is false because the Agreement had not expired and as such Sirius was still licensing its technology, and, even if Sirius argues that it had expired, W&P still had the right to sell the C-1001 inventory on hand during the Sell-Off Period.

452.    Statement (2) is false because the Agreement never expired, rather it was terminated without cause.  Nor would the Agreement have expired on December 31, 2020 because it included an automatic renewal provision.

453.    These statements are material and influenced the purchasing decisions of at least Customer A, who decided to stop purchasing the C-1001 until the issue was resolved.

454.    These representations actually deceived a substantial segment of its audience to believe that W&P did not have the right to sell the C-1001 and, that the C-1001 was being replaced by the C-1003.

/ /

/ /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

455.     The Tektite/Sirius Defendants placed the false and misleading statement into interstate commerce by placing the statement on, at a minimum, the Sirius Web Site, and otherwise issuing it as a press release.

456.     W&P has been injured as a result of the misrepresentation, by direct loss of sales (with respect to Customer A who stopped purchasing the C-1001), potential diversion of sales, and by a lessening of goodwill associated with its products.

### PRAYER FOR RELIEF AGAINST DEFENDANTS

WHEREFORE, W&P prays for the following:

#### PRIMARY SET OF PRAYERS FOR RELIEF:

A. An order declaring that the Defendants' conspiracy and the acts performed in furtherance thereof be adjudged to have violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and the California antitrust laws;

B. With respect to the state law claims asserted herein, that the Defendants' conduct be adjudged to have violated California state laws;

C. An order declaring that the Defendants be preliminarily and permanently enjoined and restrained from continuing and maintaining the conspiracy described herein;

D. An order declaring each patent Assignment to "Sirius Signal Co." null and void;

E. An order declaring the Agreement null and void for fraud;

F. An order requiring Defendants to pay to W&P the substantial upfront fee and all royalties paid by W&P to date, including those held in the court's registry;

G. An order declaring that the patents are unenforceable due to the inequitable conduct of Covelli, Simons, and Sirius;

/ / /

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

H. An order declaring that the patents are unenforceable due to the fraud committed on the USPTO by Covelli and Simons for failure to disclose Material Information to the USPTO during prosecution of the Sirius IP and the misrepresentation of the inventorship of the Sirius IP, and the submission of false documents to the USPTO;

I. An order declaring that W&P suffered a competitive injury due to the Tektite/Sirius Defendants' false patent marking, and compensating W&P accordingly;

J. An order requiring Sirius, Covelli, and Simons to indemnify W&P for any liability for infringement of any future patents issued to Sirius, Covelli, or Simons;

K. An order requiring Covelli, Simons, and Sirius to pay compensation for its unjust enrichment;

L. An order requiring Covelli to cease its unfair competition, civil conspiracy, and tortious interference with the business relations/expectancy and contractual relations of W&P and to pay compensation to W&P for its lost sales and other damages caused by same;

M. An order requiring Covelli to pay compensation for the damage to the reputation of W&P due to the Tektite/Sirius Defendants' defaming of W&P;

N. An award to W&P of compensatory and punitive damages in an amount to be determined at trial;

O. An award of enhanced damages to Plaintiff of treble the amount of compensatory damages caused by Defendants' violation of federal and state antitrust laws, and in accordance with such laws pursuant to Section 3 of the Clayton Act;

P. An award to W&P of interests, costs, and attorneys' fees;

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

Q. That Defendants pay pre-judgment and post-judgment interest on the damages awarded; and

R. Such further relief as this Court may deem just and equitable.

### SECONDARY SET OF PRAYERS FOR RELIEF:

In the event that the Court decides not to follow the Primary Set of Prayers for Relief by virtue of deciding that the Agreement will not be held null and void, W&P prays that the Court follow this Secondary Set of Prayers for Relief that includes the following:

A. An order declaring that the Defendants' conspiracy and the acts performed in furtherance thereof be adjudged to have violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and the California antitrust laws;

B. With respect to the state law claims asserted herein, that the Defendants' conduct be adjudged to have violated California state laws;

C. An order declaring that the Defendants be preliminarily and permanently enjoined and restrained from continuing and maintaining the conspiracy described herein;

D. An order declaring each patent Assignment to "Sirius Signal Co." null and void;

E. An order declaring that the Sirius, Covelli, and Simons breached the Agreement;

F. An order requiring Defendants to refund a portion of the initial license fee in accordance with the repayment schedule of the Agreement;

G. An order declaring that the patents are unenforceable due to the inequitable conduct of Covelli, Simons, and Sirius;

H. An order declaring that the patents are unenforceable due to the fraud committed on the USPTO by Covelli and Simons for failure to disclose Material Information to the USPTO during prosecution of the Sirius IP

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

and the misrepresentation of the inventorship of the Sirius IP, and the submission of false documents to the USPTO;

I.  An order declaring that W&P suffered a competitive injury due to the Tektite/Sirius Defendants' false patent marking, and compensating W&P accordingly;

J.  An order requiring Sirius, Covelli, and Simons to indemnify W&P for any liability for infringement of any future patents issued to Sirius, Covelli, or Simons;

K.  An order requiring Covelli, Simons, and Sirius to pay compensation for its unjust enrichment;

L.  An order requiring Covelli to cease its unfair competition, civil conspiracy, and tortious interference with the business relations/expectancy and contractual relations of W&P and to pay compensation to W&P for its lost sales and other damages caused by same;

M. An order requiring Covelli to pay compensation for the damage to the reputation of W&P due to the Tektite/Sirius Defendants' defaming of W&P;

N.  An award to W&P of compensatory and punitive damages in an amount to be determined at trial;

O.  An award of enhanced damages to Plaintiff of treble the amount of compensatory damages caused by Defendants' violation of federal and state antitrust laws, and in accordance with such laws;

P.  An award to W&P of interests, costs, and attorneys' fees;

Q.  That Defendants pay pre-judgment and post-judgment interest on the damages awarded; and

R.  Such further relief as this Court may deem just and equitable.

/ /

1

**REQUEST FOR JURY TRIAL**

2      457.      W&P hereby requests a jury trial on all issues so triable.

3

4   Dated: April 17, 2020              Respectfully submitted,

5

6                                      By:/s/ Richard A. Lazenby
7                                         RICHARD A. LAZENBY
                                          MICHAEL CUTLER
8                                         VICTOR RANE
                                          Attorneys for Plaintiff
9                                         WEEMS & PLATH, LLC.

10

11

VICTOR RANE
9350 Wilshire Blvd., Suite 308
Beverly Hills, California 90212
Telephone: (310) 388-4849

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                              - 99 -
CASE NO.: